The Bell Telephone Company of Pennsylvania, Petitioner *v*. Pennsylvania Public Utility Commission, Respondent. Consumer Advocate of the Commonwealth of Pennsylvania et al., Intervenors.

Argued February 6, 1979, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., ROGERS, BLATT, DISALLE and CRAIG. Judges MENCER and MACPHAIL did not participate.

*Irving R. Segal,* with him *Gerard J. St. John; Schnader, Harrison, Segal & Lewis; Donald F. Clarke;* and *Raymond F. Scully,* for petitioner.

*Charles F. Hoffman,* Assistant Counsel, with him *Daniel F. Joella,* Deputy Chief Counsel, and *George M. Kashi,* Acting Chief Counsel, for respondent.

*Selma A. Aloff,* intervenor, for herself.

*Mark P. Widoff,* with him *David L. Kurtz,* for intervenor, Consumer Advocate.

OPINION BY JUDGE CRUMLISH, JR., December 12, 1979:

The Pennsylvania Public Utility Commission, by its order of April 4, 1978, granted an increase in the annual revenues of The Bell Telephone Company of Pennsylvania amounting to $48 million. The Bell Telephone Company has appealed. The Consumer Advocate has intervened as Appellee.[1]

The Bell Telephone Company of Pennsylvania (Bell) filed proposed tariff revisions with the Pennsylvania Public Utility Commission (Commission) on November 5, 1976, calculated to produce $137.6 million in additional earnings and $10.6 million from expense savings, at June 30, 1977 level of operations.[2] On November 22, 1976, on its own motion, the Commission suspended operation of the proposed revisions until July 4, 1977, and instituted investigation R.I.D. 367 to determine their lawfulness. The suspension was subsequently extended until October 4, 1977.

Hearing was set before the Administrative Law Judge (ALJ); the Commission investigation (R.I.D. 367) and certain private formal complaints were consolidated for purposes of hearing and disposition.

On September 6, 1977, after two pre-trial conferences, 12 days of non-evidentiary hearings, 43 days of evidentiary hearings, and three days of oral argument, the ALJ issued his decision recommending a tariff revision of $80.6 million of which approximately $70 million was to come from increased rates and $10.6 million from expense savings. Exceptions to the ALJ's recommendation were filed with the Commission.

---

[1] Selma A. Aloff also intervened as appellee. Mrs. Aloff's brief was suppressed because it did not address the issues presently before this Court.

[2] In total, the proposed revisions amounted to $148,000,000.

Oral argument on the proposed tariff revision was set by the Commission for October 7, 1977, and public meetings were held December 15 and 21, 1977, to consider the ALJ's recommendation and the exceptions filed thereto by the parties. The Commission, upon review of the record, concluded that Bell had demonstrated need for an additional pre-tax return of $38.5 million. A "short form order" outlining the Commission's findings and rate design directives was issued on December 28, 1977, the final order being entered April 4, 1978. On May 11, 1978, the Commission amended its final order and allowed an additional $9.4 million in revenues finding its original calculations in error. In sum, the Commission found Bell's need for additional pre-tax return to be $48 million, of which $38 million was to come from increased revenues and $10.6 million from expense savings. In so doing, the Commission denied $100 million of the original proposed increase.

Bell filed this appeal contesting the disallowance of $16.5 million of the $100 million.

Bell is entitled by statute to earn a fair rate of return on its investment and a rate structure which denies Bell this return is confiscatory and in violation of the Pennsylvania and Federal Constitutions. Here, the Commission has determined a rate of return of 9.65% to be fair. This is not contested by Bell; rather, it argues that the rates set by the Commission fail to provide a return of 9.65% and are thus unlawful.

The making of public utility rates requires four basic determinations:

1. The company's *gross utility revenues* under the rate structure examined.

2. The *operating expenses* including all taxes appropriately incurred to produce gross revenues.

3. The *rate base,* which is all property which actually provides the service for which rates are charged and represents the base on which a return should be earned.

4. The *rate of return,* a percentage figure applied to the rate base which yields the return to which investors in the utility are reasonably entitled.

The controversy in the instant case revolves around the second and third of these determinations. With regard to *operating expenses,* Bell alleges four errors, each of which *pro tanto* would deny it a fair rate of return:

1. The Commission's disallowance of $1,714,000 of actual tax expense by the imputation to Bell of interest expense on a portion of its parent's debt.

2. The Commission's use of a three-year average of intrastate expense separation factors rather than separation factors based on test year expenses.

3. The Commission's disallowance of Bell's levelization adjustment to wage expenses.

4. The Commission's disallowance of employee discounts on local telephone service.

Regarding calculation of its *rate base,* Bell argues that the Commission erroneously excluded a portion of the cost of construction work in progress (CWIP) thereby grossly underestimating the investment upon which its investors are permitted a return of 9.65%.

For simplicity, each issue will be met separately. The position of the Consumer Advocate, Appellee, will be represented by the Commission.

### *Income Tax Expense: Allocation of Interest*

Income tax is an important component of Bell's operating expenses for which its rate payers are liable. To calculate taxable income and corresponding federal tax liability interest payable on debt must

be deducted from gross income. A large interest expense benefits Bell's rate payers by reducing its tax liability and consequently reducing its operating expenses.

Bell computed its actual interest expense for the test year to be $73,034,000. For purposes of setting rates, the Commission recalculated Bell's interest expense to include interest payments actually due on debt issued to Bell of Pennsylvania and an allocation of what it considered to be Bell's fair portion of interest expense on debt issued to A T & T,[3] its parent. As a result, the Commission disallowed $1,714,000 of what Bell claimed to be its actual income tax expense and cut pre-tax revenues by $3,616,000.

Bell contends that it is entitled to deduct as an expense the actual taxes reported in the test year attributable to intrastate operations. We agree.

The Commission advances two basis to support its action:

First, since the "systemwide"[4] capital structure was used in determining fair rate of return, "consistency demands" that "systemwide" debt ratio and debt cost be used to compute a theoretical tax expense. The determination of fair rate of return and the calculation of tax expense are entirely different functions. The former is a matter of informed judgment based upon a variety of factors. Tax expenses, however, are actual expenses which the utility must be permitted to recover in order to assure that the prescribed rates will produce the determined fair return.

Second, the Commission seeks to justify its disallowance on the assumption that a portion of Bell's

---

[3] American Telephone and Telegraph.

[4] This refers to the capital structure of the Consolidated Bell System.

capital stock is supplied by A T & T debt which results in a tax benefit to the parent. In *Bell Telephone Co. v. Pennsylvania Public Utility Commission,* 17 Pa. Commonwealth Ct. 333, 331 A.2d 572 (1975), the Commission disallowed $3.5 million of Bell's actual income tax expense on precisely the same grounds. We reversed the Commission and held the disallowance of an actual tax expense improper absent evidence:

1. That A T & T's debt is a surrogate for or supplement to Bell of Pennsylvania's financing.

2. That managerial discretion is exercised with the purpose and effect of arranging the capital structure of the parent so as to require Bell's subscribers to pay higher rates to meet taxes and of affording the parent greater tax deductions.

3. That Bell has not been afforded its fair share of tax benefits of filing a consolidated federal income tax return.

The Commission does not allege that there has been an abuse of managerial discretion in the arrangement of the corporate structure so that taxes paid were actually made to provide a financial advantage to the parent, A T & T. Nor does it contend that Bell has not been allocated its fair share of benefits flowing from consolidated federal income tax filing. Moreover, review of the record convinces us that the present corporate structure is beneficial to both the parent and the Bell of Pennsylvania subsidiary and that any tax benefit from filing a consolidated return is fairly allocated to the subsidiary. The Accounting Supervisor Reports Analyst of Pennsylvania Bell testified, without contradiction, that the income tax figure calculated by Bell is the actual amount for which it is liable under federal law, that calculations were made in accordance with methods approved by

the Internal Revenue Service, which do not permit the imputation of interest deductions, and that Bell receives its fair allotment of the benefits derived from the consolidated tax return in the form of depreciation and passes this onto the rate payers in the form of a lower rate base which produces lower rates.

Thus, the Commission's disallowance rests solely on the fact that it believed part of Bell's capital stock to be financed by A T & T debt. The Commission reasoned that since Bell of Pennsylvania's equity capital is supplied and owned by A T & T and since A T & T supplies this capital out of its general fund, "a portion, it can be assumed, came from capital raised by the parent's own issuance of debt and a portion from its retained earnings or equity." While this may very well be true, our careful review of the record reveals no evidence that Bell's equity is actually financed through debt issued to A T & T or that A T & T's debt is a supplement to or surrogate for Bell's financing. In the absence of such evidence, the Commission's disallowance of Bell's interest rests upon a hypothesis which Pennsylvania courts have consistently disallowed. *Bell Telephone Co. v. Pennsylvania Public Utility Commission, supra; see Pittsburgh v. Pennsylvania Public Utility Commission,* 208 Pa. Superior Ct. 260, 222 A.2d 395 (1966); *Penn Sheraton Hotel v. Pennsylvania Public Utility Commission,* 198 Pa. Superior Ct. 618, 184 A.2d 324 (1962); *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958).

The Commission's action disallowing $1,714,000 of income tax paid by petitioner is reversed, with direction to the Commission to add $1,714,000 to the presently allowed revenue deduction for income taxes and adjust the amount of allowable operating revenues accordingly.

### *Separation Factors: Use of a Three Year Average of Separation Factors to Allocate Intrastate Expenses*

The Public Utility Commission only has jurisdiction over Bell's intrastate operations. Thus, for purposes of computing rates, a cost allocation must be made to determine which portion of Bell's operating expenses are attributable to intrastate operations. In the instant case, the Company allocated its expenses on the basis of procedures set forth in the *Separations Manual*[5] and on data derived at the close of the test year. Each major operating expense account was separated independently by application of a separation factor calculated for the test year.

The Commission rejected Bell's actual test year separation factors and instead averaged the three most recent calendar year separation factors used by the Company to determine intrastate expenses. The effect was to disallow $3,200,000 of Bell's claimed expense and to cut net revenues by $1,584,000.

Bell protests the use of such an averaging process arguing that separation factors calculated in accordance with procedures set forth in the *Separations Manual* are binding upon the Commission and that averaging over a three-year period distorts the relationship of rate base, revenues and expenses so as to completely undermine the test year concept.

We disagree. While the procedures set forth in the *Separations Manual* are the most accepted method

---

[5] The 1947 Separations Manual was the result of collaboration between A T & T and the Telephone Problem Committee of the National Association of Railroad and Utilities Commissions (NARUC) and subcommittee comprised of NARUC technical staff personnel. It is the first published statement of separations principles and the most widely used procedure for allocating intrastate revenues costs and rate base. *See* R. Gabel, Development of Separations Principles in the Telephone Industry (1967).

for allocating expenses, our review of the relevant statute[6] and case law reveals no requirement that such method be used in every instance. Moreover, we are unaware of any jurisdiction which has imposed such a restriction upon its state regulatory commissions.

It is the Commission's duty to establish rates which are fair and reasonable and it may utilize any method of cost allocation which accomplishes this purpose and ensures a fair rate of return to the utility company. Further, the fundamental purpose of the test year is to provide a basis for making the most accurate forecast of a utility's rate base, revenues and expenses in the near future when the prescribed rates are to be in effect and to the extent that revenues and expenses for the test year do not accurately indicate future revenue and cost trends the Commission has the duty to make adjustments.

In the case *sub judice* the Commission found that separations factors had fluctuated significantly within a narrow band in recent years and that components included in the separations factors had moved in divergent directions. It concluded, as a result, that separations factors based solely on test year data did not actually reflect the true level of costs associated with providing intrastate service and that a three-year average of separations factors was more appropriate.

The Commission's findings of fluctuation are supported by substantial evidence. Moreover, there is no evidence on the record contradicting the Commission's conclusion and demonstrating that the test year separation factors are in fact representative of future expense trends, which Bell had the burden of proving. Therefore, the Commission's allocation of intrastate expenses on the basis of a three-year average of separation factors is affirmed.

---

[6] Public Utility Code, 66 Pa. C.S. §101 et seq.

*Levelization of Wage Expenses*

Bell proposed adjustment of its actually experienced test year expenses by an additional $10,848,000 to account for "the going level of operations" at the end of the test year. The Commission accepted Bell's proposed "levelization" adjustment of $4,715,000 for depreciation but disallowed $4,639,000 of the remaining $6,133,000 because 75% of this figure represented an adjustment for wage and wage-related expenses accounted for in its out-of-period wage adjustment. The Commission held:

> We considered a similar issue in the most recent Bell case (50 Pa. PUC at 66-67) and held that there was a duplication of wage expenses. We believe that there has been a duplication here also. Bell adjusted its test year wages to reflect out-of-period wage increases. We have already allowed an adjustment for this expense elsewhere, infra. By doing this, we are allowing the annualization of an out-of-period wage expense upon the test year base wage expenses for the amount of people who would be employed beyond the test year. There is no reason for allowing still another adjustment to bring wages up to the year end level since the wage increases in the future would be accounted for through out-of-period wage adjustment.

51 Pa. P.U.C. Rep. 570, 589 (1977).

While Bell does not dispute the Commission's finding that 75% of its expenses (minus depreciation expenses) are attributable to labor, it does challenge the Commission's conclusion that levelization of such expenses results in duplication of labor costs allowed in the out-of-period adjustment.

> The Commission misconceives the function of the wage portion of the levelization adjustments. . . .

The function of the wage portion of the levelization adjustment was to annualize the numerous wage increases which occurred on various dates throughout the test year because of promotions and time in service (i.e., 'progression' [raises]). The Commission confuses these increases with the across-the-board wage *rate* increases which occurred on August 6, 1976 (for 24,000 employes) and on October 1, 1976 and March 1, 1977 (for 8,000 employees) —which Bell annualized in a separate adjustment. The *promotion* and *progression* adjustment does not duplicate the wage *rate* adjustment.... (Emphasis in original.)

Reply Brief for Petitioner at 16.

Bell's argument would appear to have some merit. The record discloses that the out-of-period wage adjustment of $40,500,000 was to reflect wage increases resulting from Bell's most recent labor agreement signed in August, 1977, and a wage increase for non-represented management employees effective October 1, 1977. It makes no mention of any out-of-period adjustments due to progression and promotion raises.

While the Commission's order clearly describes the method by which it computed the $4,639,000 disallowance, it does not show the precise calculation by which it determined that Bell's "levelization" of expenses resulted in a duplication of out-of-period wage expenses. Thus, we are unable to evaluate whether as a matter of law the Commission abused its discretion or committed an error. The Consumer Advocate's brief speaks at great length endeavoring to explain how this conclusion was calculated. These explanations are unacceptable.

Therefore, we remand and direct the Commission to delineate the precise calculations used to determine that Bell's levelization of wage and salary expense

results in a duplication of the out-of-period wage adjustment.

### Disallowance of Local Telephone Service Discounts to Employees

In determining Bell's allowable revenues and expenses for rate making purposes, the Commission imputed $3,381,000 in revenues and disallowed $728,000 in expenses, determining that local telephone[7] service discounts for employees provided by Bell should not be subsidized by rate payers. The Commission reasoned:

> Rate-payers are already being charged for the wages and salaries paid to Company's employees; they should not be called upon to reimburse the Company for providing the employees with discounted and free telephone service also.
>
> In the absence of any showing that discounted service is required for the safe and reliable operation of the network, the telephone subscriber should not be required to subsidize telephone service for employees and pensioners which necessarily are so personal in nature. This is not to say that the company's prohibited from furnishing this service if it so desires. We simply hold that the rate payers of Bell Telephone should not be required to pay for the Company's largesse.

51 Pa. P.U.C. Rep. 570, 588 (1977).

Bell contends that the Commission's disallowance is an abuse of discretion in that it unreasonably interferes with managerial prerogative in setting personnel policy.

---

[7] The Commission also disallowed toll telephone service discounts to employees. Bell did not appeal this disallowance.

The Commission functions as the representative of the public and serves to protect its rights by insuring adequate and continuous service at the lowest rates which permit the utility to earn a fair return on its capital investment. It is axiomatic that inherent in the Commission's duty to establish rates which are fair and reasonable and in the public interest is the power to reasonably supervise and regulate the business of public utilities in matters concerning service and operating facilities, including the right to determine the legitimacy of expenses reported by the utility.

Bell argues that employee discounts are a recognized fringe benefit which in the judgment of its management are an economical method of compensation in lieu of actual cash outlay and are necessary to acquire and retain employees qualified to give the public superior service. However, as the Commission found, there is no evidence recorded which demonstrates that discontinuance of employee discounts will cause employees to demand the equivalent dollar value in higher wages or that the quality of telephone service will be adversely affected.

While we agree with Bell's argument that employee discounts are not unjustly discriminatory or preferential when such discounts compensate employees for wages which would otherwise be higher, in the instant case there is simply no evidence to support the hypothesis that eliminating discounts will trigger such demands.

As we have often said, the establishment of rate structure is an administrative function peculiarly within the expertise of the Commission. This Court's scope of review is limited to a determination of whether constitutional rights have been violated, an error of law has been committed or whether findings of the Commission are not supported by substantial

evidence. *Zucker v. Pennsylvania Public Utility Commission,* Pa. Commonwealth Ct. , 401 A.2d 1377 (1979). Bell had the burden of proving that its expenses were necessary and prudent to providing service to the public. We are not persuaded that Bell carried its burden and the Commission's disallowance, being within its administrative province, must be affirmed.

### Exclusion of Cost of Work in Progress from the Rate Base

Bell included $98,658,000 in its rate base which it contends represents construction work in progress (CWIP) which will be in operation within six months after the end of the test year (June 30, 1977). The Commission excluded the entire amount, finding that the property was not used or useful to the production of service.

Bell protests the disallowance on the grounds:

1. Exclusion of CWIP is an error of law.

2. The Commission's allowance of only 9% return on interest on CWIP, instead of the overall rate of return of 9.65%, is confiscatory.

The Pennsylvania Public Utility Code, 66 Pa. C.S. §101 et seq., authorizes utilities to seek a just and reasonable return on the fair value of property used and useful in the public service. What constitutes used and useful utility property is committed to the discretion of the Commission. If the Commission reasonably finds that a particular class of property is not used or useful in serving the public, it may exclude the value of that property from the rate base and thus disallow the utility's return on that property.

Once again, we must be mindful that the burden is on the utility to establish that the property sought to be included is used and useful in the public service.

The Commission has consistently excluded CWIP from the rate base because it does not constitute property used and useful. Since rate payers receive no benefit from a new plant or facility under construction until it is actually completed, we cannot say that the exercise of this judgment is an abuse of discretion.

Moreover, where the Commission has included CWIP, it has been in limited circumstances. *See Pennsylvania Public Utility Commission v. Philadelphia Suburban Water Co.*, 50 Pa. P.U.C. 407 (1976); *Pennsylvania Public Utility Commission v. Peoples Natural Gas Co.*, 48 Pa. P.U.C. 210 (1974); *Pennsylvania Public Utility Commission v. Duquesne Light Co.*, 48 Pa. P.U.C. 14 (1974). In summary, substantial expenditures for projects to be completed after the end of the test year will be allowed only if they do not affect the level of operations at year end, i.e., they are non-revenue producing and non-expense reducing, and improve the environment and/or reliability and safety of service. *Pennsylvania Public Utility Commission v. Peoples Natural Gas Co.*, 44 Pa. P.U.C. 102 (1969).

The amount sought by Bell to be included in the rate base covers some 1300 projects but the company provided documentation on only 61. The Commission found that more than 1/3 of this representative sample could be characterized as revenue producing and 26% could be termed revenue producing and expense reducing, which was insufficient to carry Bell's formidable burden of proof. We cannot say that we disagree.

Bell, in pressing its contention, agues that it is entitled to a fair rate of return on investment in property essential to the continued operation of the utility even though such property is not yet in service. *Duquesne Light Co. v. Pennsylvania Public*

*Utility Commission,* 176 Pa. Superior Ct. 568, 107 A.2d 745 (1954). It urges that no one can dispute that the proposed projects are necessary to the continued provision of quality telephone service.

The record belies such a finding. The only evidence of the necessity of the proposed projects is the testimony of Bell's General Accountant who stated that "the investment represented by [the Plant Under Construction Account] is essential to the continued provision of good and improving telephone service." Without more, this is insufficient to sustain Bell's heavy burden of proof.

Finally, Bell argues that the disallowance of CWIP is confiscatory because in excluding it from the rate base, the Commission limited the return which Bell could earn on those plants to 9%, the rate of Bell's interest charges during construction, 65 basis points below the overall rate of return of 9.65% which the Commission deemed to be fair. Somehow, the rationale of this argument escapes us.

First, we reiterate that CWIP is not used and useful property and therefore is not entitled to any return until it is actually in service.

Second, the 9% return to which Bell refers is the rate at which the Commission permitted Bell to capitalize interest on debt used to finance construction. We fail to understand how this will foreclose Bell from earning the full rate of return once the property is actually in service. When Bell puts the new structure into service, the value of the new property plus the capitalized interest will be included in the rate base. Once included, Bell will be permitted to earn on its property whatever rate of return the Commission establishes as reasonable for used and useful property in subsequent rate cases. The Commission's disallowance of CWIP is affirmed.

Accordingly, we

ORDER

AND Now, this 12th day of December, 1979, after careful consideration of the law and scrutiny of the record, we

1. Reverse the Public Utility Commission's (Commission) disallowance of $1,714,000 of Bell of Pennsylvania's (Bell) actual income tax expense with the direction that $1,714,000 be added to the presently allowed revenue deduction for income taxes and that allowable operating revenues be adjusted accordingly.

2. Set aside and remand the Commission's disallowance of Bell's $4,639,000 wage and salary levelization adjustment with the direction that the precise calculations used to determine that Bell's levelization of such expenses results in a duplication of out-of-period wage adjustment be set forth.

3. Affirm the Commission's disallowance of employee discounts on local telephone service and the resulting imputation of $3,381,000 to revenues and $728,000 expense cut.

4. Affirm the Commission's use of a three-year average of separation factors rather than factors based solely on test year data.

5. Affirm the Commission's exclusion of $98,658,000 cost of construction work in progress from Bell's rate base.