402

Pennsylvania Electric Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Office of Consumer Advocate et al., Intervenors.

Pennsylvania Electric Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Office of Consumer Advocate, Intervenor.

Metropolitan Edison Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Office of Consumer Advocate et al., Intervenors.

Argued November 16, 1982, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR. and MACPHAIL.

*Samuel B. Russell,* with him *W. Edwin Ogden, Ryan, Russell & McConaghy,* and *James B. Liberman, Berlack, Israels & Liberman,* for petitioners.

*Bohdan R. Pankiw,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

*David M. Barasch,* Assistant Consumer Advocate, with him *Walter W. Cohen,* Consumer Advocate, and *Maurice A. Frater, McNees, Wallace & Nurick,* for intervenor, Office of Consumer Advocate.

*John M. Quain,* for intervenor, American Society of Utility Investors.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., November 18, 1983:

We have consolidated for argument and disposition the four appeals of Pennsylvania Electric Company (Penelec) and Metropolitan Edison Company (Met-Ed) from four orders of the Public Utility Commission (Commission) entered June 8, 1981 and July 27, 1981. The two Commission orders entered June 8, 1981 dismissed the complaints of Penelec and Met-Ed against temporary rates previously fixed by the Commission by orders entered May 23, 1980. The two Commission orders of July 27, 1981, allowed Penelec and Met-Ed annual rate increases of $55,445,000 and $51,804,000, respectively. We affirm.

## HISTORY OF THE CASE

This proceeding is another repercussion of the March 28, 1979 accident at the Three Mile Island nuclear-powered generating station Unit No. 2 (TMI-2). Met-Ed and Penelec own a 50% and 25% interest, respectively, in the generating station.[1] In response to the accident, the Commission set temporary rates for Met-Ed on April 19, 1979 and for Penelec on April 25, 1979, reflecting the removal of TMI-2 related costs. The Commission adopted an order on June 15, 1979,

---

[1] Except for the figures involved, the arguments of Met-Ed and Penelec are identical. The utilities will be referred to collectively as "companies."

concluding in part that TMI-2 was no longer used and useful in public service and all costs associated with that unit must be removed from rates.[2] Pursuant to this conclusion, the Commission made permanent the temporary rates then in effect.

At the time of the accident, Unit No. 1 (TMI-1) had been shut down for refueling. On September 20, 1979, the Commission ordered Met-Ed and Penelec to show cause why TMI-1 should be considered used and useful and why all costs associated therewith should not be removed from rates.[3] On November 27, 1979, Met-Ed and Penelec proposed that a future test year be utilized to provide the necessary factual basis for revision of the rates of the companies if TMI-1 were to be removed from their respective rates. In a prehearing order adopted December 21, 1979, the Commission declined to set a test year for such purposes on the grounds that the level of just and reasonable rates for Met-Ed and Penelec were not then an issue before the Commission in that proceeding.

By order of May 23, 1980, the Commission determined that TMI-1 was not used or useful in the public service. Accordingly, TMI-1 was excluded from the rate bases of Met-Ed and Penelec. Pursuant to Section 1310 of the Public Utility Code (Code), 66 Pa. C. S. §1310, the Commission established temporary rates for Met-Ed and Penelec at an annual level which was $26.9 million and $11.7 million, respectively, less than their existing rates. This decrease reflected the exclusion of TMI-1 from the companies' rate bases.

---

[2] A public utility is allowed to charge rates which will permit it to earn a fair return on the fair value of its property which is used and useful in the public service. *See Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979).

[3] TMI-1 has remained shut down by order of the Federal Nuclear Regulatory Commission.

On July 29, 1980, both Met-Ed and Penelec filed complaints against the respective temporary rates, alleging that these temporary rates were unjust and unreasonable. Pursuant to Section 1308(d) of the Code, Met-Ed and Penelec also filed Tariff No. 44 seeking a $76.4 million increase in rates and Tariff No. 75, seeking a $67.4 million increase in rates, respectively. Testimony was taken before the ALJ on twenty-two days between October 20, 1980 and January 23, 1981. The ALJ recommended in his March 20, 1981 decision that Met-Ed's and Penelec's complaints against temporary rates be dismissed. The Commission's order of June 8, 1981, adopted this decision. The Commission's final orders of July 27, 1981, allowed Met-Ed an annual rate increase of $51,804,000 (including $11 million covering TMI-1 restart costs) over and above the temporary rates and allowed Penelec an annual rate increase of $55,445,000 (including $5.5 million covering TMI-1 restart costs) over and above the temporary rates.

The companies have raised a number of issues on appeal. First, with regard to the temporary rates, the companies contend that the record compels the conclusion that they have proven the need for an increase in the level of their temporary rates of at least $11.7 million for Penelec and $26.9 million for Met-Ed. Further, the companies contend that retroactive recoupment is required in connection with any shortfall which is found to exist in the adequacy of the Commission fixed temporary rates. Second, the companies contend that the final rates under the July 27, 1981 order are not just and reasonable pursuant to statutory and constitutional standards. Third, the companies pray that the Commission's order of July 27, 1981, should be clarified to ensure that benefits of present reserve capacity expense credits shall flow in the future only to those parties who are reasonably entitled to those benefits.

Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or the findings or order of the Commission are not supported by substantial evidence. *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 285, 289, 433 A.2d 610, 613 (1981).

### Temporary Rate Increase

The companies' argument as to the Commission's fixed temporary rates is twofold. They contend first that the ALJ's findings as adopted by the Commission are inconsistent; and second, that retroactive recoupment is required in connection with any shortfall which is found to exist in the adequacy of the temporary rates. The alleged inconsistency lies in that the ALJ found, based on the future test year ending March 31, 1981, the annual revenue requirements of Penelec and Met-Ed to be $54,890,000 and $49,789,000 above the temporary rates. Yet, he also found that neither Met-Ed nor Penelec met their burden of showing that the temporary rates were not just and reasonable.

We hold that the ALJ's finding as to the future test year revenue requirements entitles the companies to prospective rate relief only. The fact that the Commission has granted a prospective rate increase does not establish the unreasonableness of the lower temporary rates previously in effect. *See Pendergast v. New York Telephone Co.,* 262 U.S. 43 (1923). Indeed, the very reason for the lower temporary rates was continued and followed by the Commission in its granting of the permanent rate increases. Just as the operating expenses and capital costs of TMI-1 were removed from the companies' then-existing rate bases to establish the temporary rates, these expenses and costs were not included in the rate bases to determine

the permanent rate increases granted by the Commission.

The companies also submit that retroactive recoupment is required in connection with any shortfall which is found to exist in the adequacy of the Commission's fixed temporary rates. They argue that, since the Commission endorsed the ALJ's recommended finding as to the required permanent rate increases, there are shortfalls, *per se,* in the level of the temporary rates. Therefore, they contend that they should be able to recoup, at the very least, $26.9 million for Met-Ed and $11.7 million for Penelec of these shortfalls.

Section 1310 of the Code does create a "retroactive ratemaking mechanism by requiring the Commission to consider the effect of inadequate rates set on a temporary basis when fixing the amount of permanent rates thereafter approved." *See Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 69 Pa. Commonwealth Ct. 554, 560, 452 A.2d 86, 89 (1982) (footnote omitted). Section 1310(e) provides, in part:

> In every proceeding in which temporary rates are fixed, determined, and prescribed under this section, the commission shall consider the effect of such rates in fixing, determining, and prescribing rates to be thereafter demanded or received by such public utility on final determination of the rate proceeding.

The companies have not sustained their burden of showing that the Commission did not consider the effect of the temporary rates.[4] Under Section 1310(d)

---

[4] Commissioner Michael Johnson stated in his concurring opinion to the order adopting the ALJ's recommended decision:

[The companies' argument] ignores the Commission's discretion to adjust rates that have been based on a future test year where the supporting documentation has been proven

of the Code, whenever the Commission is of the opinion that rates of a utility are producing a return in excess of a fair rate of return, it may prescribe temporary rates that will produce a fair return. In the case *sub judice,* the Commission, having found that TMI-1 was no longer "used or useful," removed TMI-1's capital costs and operating expenses from the rate bases and properly prescribed lower temporary rates producing fair rates of return on the lower rate bases. The record shows that the rates of return clearly exceeded the minimum statutory standard of 5%.[5] Thus, the temporary rates were proper *ab initio.* In granting the permanent prospective rates under Section 1308, TMI-1's capital costs and operating expenses were still excluded from the rate bases entitling the companies to no retroactive recoupment. Indeed, financial problems caused by the removal of TMI-1 from the rate bases were addressed and relieved by provisions in the permanent rate increases.

to be significantly in error. It ignores the fact that the Commission has provided for full and current recovery of replacement and purchased power expenses and the fact that the revenues associated with TMI-1 had been continually collected in base rates while the unit was out of service through May 1980, fourteen months after its scheduled return to service[,] . . . eight months after the Commission issued the used and useful show cause order, and it ignores the fact that the unit was included in base rates for five months beyond the period originally accepted by the Commission for its reasonable return to service. Furthermore, in the consolidated general rate proceedings the Commission has authorized both utilities to restate the respective depreciation reserves associated with both Three Mile Island units. . . .

. . . .

. . . The ratepayers cannot be held accountable in this temporary rate complaint proceeding for the attrition of earnings that is and has been properly accounted for in the accompanying general rate proceeding.

[5] Section 1310(c) of the Public Utility Code.

## The Final Rate Order

The companies' second major argument on appeal is that the final rates were not just and reasonable pursuant to statutory and constitutional requirements. The companies contend that the disallowance of the great bulk of the capital costs and operating expenses of TMI-1 from the rate base on the ground that the unit was not used and useful in public service forced investors and shareholders to bear expenses which should have been borne by the utilities' ratepayers as a whole.

The Commission's exclusion of capital costs and operating expenses of TMI-1 was proper. In *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 325, 329, 433 A.2d 620, 623 (1981), we stated:

> The touchstone for determining whether or not a prudently constructed unit should be included in a utility's rate base is whether or not, during the test year involved the unit will be used and useful in rendering service to the public.

"What constitutes used and useful utility property is committed to the discretion of the Commission." *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 614, 629, 408 A.2d 917, 925 (1979). Further, the burden is on the utility to establish that the property sought to be included is used and useful in the public service. *Id.* at 629, 408 A.2d at 925. We are not persuaded that the companies have carried this burden.

The companies rely on the decision of our Supreme Court in *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Co.*, 492 Pa. 326, 424 A.2d 1213 (1980), to support a "pragmatic adjustment" theory applied by Federal Courts as expressed in *Federal Power Commission v. Hope Natural Gas Co.*, 320

U.S. 591 (1944).[6] We do not, however, interpret our Supreme Court's decision in *Pennsylvania Gas & Water Co.* as rejecting the traditional rate-making principles espoused in *Bell of Pennsylvania* and *Philadelphia Electric Co.* As this Court stated in *Dauphin Consolidated Water Supply Co. v. Pennsylvania Public Utility Commission,* 55 Pa. Commonwealth Ct. 624, 628, 423 A.2d 1357, 1359 (1980):

> The thrust of [Pennsylvania Gas & Water] was to dispel any assumption of a constitutionally-mandated nexus between fair value and cost of reproduction or trended original cost figures. . . . However, [its] functional effect was to put the economic theories and policies underlying public utility property valuations strictly in the hands of the Commission so long as fair value was set somewhere between original cost and trended original cost. (Citations omitted.)

We find that the Commission did not abuse its discretion in finding that TMI-1 was not used or useful and thus in excluding its capital and operating costs from the rate bases. The actions of the Commission do reflect a balancing of investor and consumer interests as prescribed by the Supreme Court in *Pennsylvania Gas & Water Co.* The allowed increase for Penelec included $5.5 million for TMI-1 related costs and reflected a 16.5% rate of return on common equity capital. The allowed increase for Met-Ed included $11 million for TMI-1 related costs and reflected a 17% rate of return on common equity capital. This is the highest rate ever allowed a Pennsylvania utility.[7] Further, TMI-1 was out of service for a full 14 months before its capital costs and operating expenses were

---

[6] This Court rejected the *Hope* doctrine in *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 33 Pa. Commonwealth Ct. 403, 381 A.2d 1337 (1978).

[7] Respondent's brief, p. 39.

excluded from the companies' rate bases. Finally, the Commission normalized the reserve capacity expense credits, discussed *infra,* which allowed the reserve capacity expense to be shown in the test year as $11.4 million higher than the actual reserve capacity expense. For these reasons, we find the Commission properly balanced investor and consumer interests in excluding TMI-1 capital costs and operating expenses from the companies' rate bases.[8]

NORMALIZATION OF THE RESERVE CAPACITY EXPENSE

The companies' final argument on appeal is that the Commission's order of July 27, 1981, should be clarified to ensure that benefits of present reserve capacity expense credits shall flow in the future only to those parties who are reasonably entitled to those benefits.

The companies participate in power-pooling agreements which require that the member utilities maintain certain levels of reserve generating capacity. In the absence of such reserves, the defaulting utility must make reserve capacity payments to those utilities whose generating reserves help to make up its shortfall. There is a three-year lag provision in the agreements. In the general rate increase proceeding, the reserve capacity expenses claimed by the companies did not reflect a $11.4 million and $23.1 million credit available to Penelec and Met-Ed, respectively, for the twelve-month period ending March 31, 1981

---

[8] In *In Re Jersey Central Power & Light Petition,* 85 N.J. 520, 428 A.2d 498 (1981), the Supreme Court of New Jersey found that TMI-1 was properly removed from Jersey Central Power & Light Company's rate base. This company, also a subsidiary of General Public Utility Corporation, owns the remaining 25% interest in the Three Mile Island Generating Station. The Court rejected the company's argument that the utility board did not give attention to all relevant factors, such as its financial problems.

(the future test year). Thus, the claimed reserve capacity expenses figured in the rate base were $11.4 million and $23.1 million higher than the actual reserve capacity expense. The Commission determined that, due to the companies' financial difficulties, these current credits should be normalized rather than reflected in customer rates.

The companies contend that the benefits from these credits should only go to those who bear the capital cost of the units. They argue that the benefits should only go to the ratepayers when TMI-1 and TMI-2 capital costs are included in the companies' rate bases. According to the companies, at such time when the capital costs are again included in the rate bases, the normalization reserve would be drawn upon to the extent required so that the ratepayers in that future period shall receive the full normal credit against reserve capacity expense which that unit would then provide had there been no intervening outages. Any excess normalization reserve would inure to the benefit of the companies.

The companies ignore the fact that the current reserve capacity expense credits are based on a lagging three-year historical average. Thus, the $11.4 million and $23.1 million credits for the future test year are actually associated with prior periods, where full capital costs of TMI-1 and TMI-2 were reflected in customers' rates. By normalizing the expense credits, the Commission has allowed, in effect, an interest-free loan by customers to the utilities. "The Commission has a wide area of discretion with respect to the extent and type of adjustments which it [can] make to test year data providing there is substantial evidence in the record warranting its action." *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 551, 560, 128 A.2d 372, 376 (1956). The Commission contends that it is within its discretion to

order the normalization of these credits to strike a balance between investor and consumer interests.[9] We agree. The normalization of these credits reflected an awareness of the financial difficulties of the utilities while at the same time recognizing the ratepayers' eventual claim to the credits.

Affirmed.

### ORDER

The orders of the Pennsylvania Public Utility Commission entered June 8, 1981, dismissing the complaints of Pennsylvania Electric Company at C-80072106 and Metropolitan Edison Company at C-80072105, are affirmed.

The orders of the Pennsylvania Public Utility Commission entered July 27, 1981, granting, in part, the requested rate increases of Pennsylvania Electric Company at R-80051197 and Metropolitan Edison Company at R-80051196, are affirmed.

_____

[9] The Commission rejected the argument of the Office of Consumer Advocate that the present rates should reflect only actual reserve capacity expense.