524 A.2d 1009

The Bell Telephone Company of Pennsylvania, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

David M. Barasch, Acting Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Argued June 11, 1986, before President Judge CRUMLISH, JR., Judges CRAIG, MACPHAIL, BARRY and COLINS.

*Daniel J. Whelan,* with him, *William L. Leonard, Daniel E. Monagle, J. Lindsay Johnston,* and *David N. Kleppinger,* for petitioner/intervenor, The Bell Telephone Company of Pennsylvania.

*Daniel Clearfield,* Assistant Consumer Advocate, with him, *Kathleen Cook,* Legal Assistant, *David M. Barasch,* Consumer Advocate, and *H. Kay Dailey,* Assistant Consumer Advocate, for respondent.

*John A. Levin,* Assistant Counsel, with him, *Albert W. Johnson, III,* Deputy Chief Counsel, *Charles F. Hoffman,* Chief Counsel, *Bohdan R. Pankiw* and *James A. Cole,* for respondent, Pennsylvania Public Utility Commission.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., April 15, 1987:

Bell Telephone Company of Pennsylvania (Bell) and the Office of Consumer Advocate (OCA) cross appeal a Pennsylvania Public Utility Commission (PUC) order granting Bell a rate increase of $198,471,000. Bell and the OCA have intervened on behalf of the PUC in each other's respective actions. We affirm in part and vacate and remand in part.

On March 29, 1983, Bell filed revisions to Tariffs-Pa. PUC No. 1, 1A, 1D, 2C, 180A, 182, 182A, 185B, 185C, 295, 298 and 300 and filed a new Tariff-Pa. PUC No. 301 calculated to produce additional annual intrastate operating revenues of approximately $382,000,000 based upon the estimated level of operations for the future test year ending December 31, 1983. The PUC suspended the proposed tariffs until December 28, 1983, instituted an investigation and considered several formal complaints. Public hearings were held, after which Administrative Law Judge NEMEC (ALJ) issued a recommended decision proposing an allowance of $96,500,000 of the additional revenue requested. Ruling upon exceptions to the ALJ's recommended decision, the PUC issued a short form order on December 29, 1983, in which it concluded that Bell had proven a need for additional annual revenues of $207,600,000. On January 5, 1984, certain corrections were adopted to reduce the rate increase to $198,471,000. The PUC entered a long form order on November 21, 1984, modifying in part and superseding in part the short form order. Bell and the OCA appeal this order.

Our scope of review of a PUC order in a rate case is limited to determining whether the Commission violated constitutional rights, committed an error of law, or made findings of fact that are not supported by substantial evidence. *Green v. Pennsylvania Public Utility Commission*, 81 Pa. Commonwealth Ct. 55, 473 A.2d 209 (1984), *aff'd sub nom. Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 430, 490 A.2d 806 (1985).

The bulk of the issues presented in this case arise from the Modification of Final Judgment, approved by the United States District Court for the District of Columbia in *United States v. American Telephone and Telegraph Co.*, 552 F. Supp. 131 (1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983),

which, in part, sanctioned the divestiture by American Telephone and Telegraph Company (AT&T) of the Bell Operating Companies. This momentous decision has spawned an abundance of administrative and judicial activity, including the instant litigation. We note at the outset the historical significance of the preceding events and approach with circumspection the issues before us.

In this appeal, Bell contends that the PUC improperly disallowed its income tax expense proposal and certain previously approved amortization expenses. The OCA's primary challenge involves the PUC's allowance of a $143.7 million "public policy" revenue increase. The OCA also alleges error as to the PUC's rejection of certain wage proposals, equipment expense proposals and tax deferrals.

## BELL APPEAL
### No. 279 C.D. 1984
*Income Tax Expense Allowance*

Bell challenges the PUC's disallowance of $2,404,000 of Bell's proposed income tax expense for the test year ending December 31, 1983. Bell argues that the PUC has impermissibly created a *hypothetical* interest expense derived from an estimated capital structure rather than using Bell's "actual" test year income tax expense. Bell relies upon several decisions of this Court which held that the use of "hypothetical" rather than "actual" test year interest expense for the purpose of calculating federal income tax expense is improper absent evidence that management had abused its discretion in arranging capital structure. *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 83 Pa. Commonwealth Ct. 331, 478 A.2d 921 (1984), *allocatur granted,* Nos. 13 and 14 M.D. Appeal Docket, filed February 12, 1985 *(Bell III).*[1]

---

[1] *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 17 Pa. Commonwealth Ct. 333, 331 A.2d 572

The PUC and the OCA respond that because income tax expenses are calculated on the basis of assumed levels of revenues and expenses for test year purposes,[2] tax expenses are only "actual" to the extent they reflect adjusted *pro forma*[3] net income. Both the PUC and the OCA contest the accuracy of Bell's *pro forma* "actual" interest expense calculations by pointing to the testimony of Bell's own tax witness, who based his estimate of Bell's interest expense upon several allegedly inexact assumptions.[4]

The PUC determined that based upon the testimony of an OCA tax witness, Bell was capitalizing interest expense on its construction program at a pre-tax rate without reflecting in IDC (interest deduction calcula-

(1975) *(Bell I); Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979) *(Bell II).*

In *Bell II,* we stated:
The determination of fair rate of return and the calculation of tax expense are entirely different functions. The former is a matter of informed judgment based upon a variety of factors. Tax expenses, however, are actual expenses which the utility must be permitted to recover in order to assure that the prescribed rates will produce the determined fair return.
*Id.* at 620, 408 A.2d at 921.

[2] In the instant case, Bell's claim of "actual" test year figures reflected three months of recorded data and nine months of projected data derived from its 1983 budget.

[3] *Pro forma* is a term used to designate test year figures which have been adjusted for ratemaking purposes. *See* J. Cawley & N. Kennard, *Rate Case Handbook* 151 (1983).

[4] Bell's tax witness indicated that Bell's proposed interest expense would be its actual interest expense if the following events occurred: (1) Bell filed a separate tax return; (2) Bell's actual operations reflected every change normalization and rate base adjustment sought by it below; (3) 1984 test year revenues were as predicted; (4) Bell filed a tax return only for its intrastate operations; and (5) operations continued in exactly the same fashion.

tion) the tax deduction that is received on such interest. The PUC further determined that in the future when IDC is in the rate base and depreciated, Bell would recover present interest incurred on the construction program without any indication of present tax deductions. Therefore, the PUC concluded that the most accurate measure of Bell's "actual" interest expense for federal income tax purposes was to compute interest expense based upon the final rate base allowance and the weighted cost of debt. Long Form Opinion, p. 74.

We do not believe that *Bell II* and *Bell III* are dispositive on the issue of what constitutes "actual" interest expense for federal income tax purposes in the instant appeal. *Bell II* and *Bell III* involved situations where the PUC was contending that Bell's interest expense deduction be based upon AT&T's capital structure to the extent that AT&T debt was a surrogate for or supplement to Bell's financing. In the instant case, the dispute centers on the use of the estimated capital structure and estimated rate of return to determine the allowable tax expense. While this Court has been consistent in its application of an "actual taxes paid" rule, the rationale for that rule fails in this situation. While normally taxes are "actual" expenses which the utility must be permitted to recover to assure that prescribed rates will produce a fair return, it is unlikely the tax expense actually paid by Bell in recent years will resemble those for the test year here at issue in light of the AT&T divestiture. Moreover, we note that Bell has not established an "actual" tax expense as this Court has used that term but rather bases its calculation upon several inexact assumptions. Therefore, in light of the great transition Bell was to undergo in this test year, we hold that the PUC's calculation of interest expense for federal income tax purposes was based on sound ratemaking

principles and thus constitutes no error of law.[5] Accordingly, we affirm the PUC's disallowance of $2,404,000 of Bell's proposed test year income tax expense.

## Amortization Expenses

Bell further contests the PUC's disallowance of $1,660,000 of previously approved amortization expenses attributable to a one-time purchase of customer premises equipment (CPE). The PUC determined that, based upon Bell's obligation to transfer most of its CPE to an AT&T subsidiary (ATTIS) pursuant to the telephone industry's reorganization, it was inappropriate for Bell's Pennsylvania ratepayers to pay for costs associated with equipment no longer provided by Bell.

Bell contends that the disallowance of a previously authorized expense constitutes impermissible retroactive ratemaking and that the failure to permit full recovery of amortized expenses results in an unconstitutional confiscation.[6] *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980). While we agree with Bell that if its costs were not recoverable, an impermissible confiscation would result, we do not believe that Bell is precluded from recovering the remainder of these amortized expenses.

---

[5] *Bell II* requires that interest payable on debt be deducted from gross income. We consider the PUC's calculation of interest expenses to be reasonable in light of its estimation of Bell's projected final rate base allowance and the weighted cost of debt.

[6] The PUC and OCA contend that because these amortized CPE expenses are inherently estimated values, the present value is uncertain and has been overstated by Bell. We agree with Bell, however, that there is no evidence to indicate that Bell's actual tariff implementation expenses were lower than the amounts allowed by the PUC.

As noted by the OCA in its brief, the PUC denied Bell's ability to recover these amortized expenses only from customers no longer leasing CPE from Bell. Those customers continuing to rent CPE from Bell remain responsible for paying its amortized costs. Moreover, as the PUC and the OCA contend, Bell is free to petition the Federal Communications Commission or the United States District Court for compensation for CPE transferred to ATTIS as part of the AT&T antitrust settlement. Therefore, we hold that the PUC's reduction of one-time expenses for equipment no longer used by Bell ratepayers was not an error of law nor a violation of Bell's constitutional rights.

## OCA APPEAL
## No. 372 C.D. 1984

### Public Policy Adjustments

In its appeal, the OCA contends that the PUC's award of $143.7 million in revenues to cover Bell's claimed "public policy out-of-period" adjustments was an error of law and not supported by substantial evidence. The OCA maintains that Bell's estimates of revenue requirements caused by the AT&T divestiture and other public policy changes, which were adopted by the PUC with some modifications, are too speculative and unreliable to form the basis for an additional revenue requirement burden on Bell's customers. The OCA further contends that a proper quantification of the effect of divestiture would result in a revenue requirement decrease of approximately $27.5 million rather than the revenue increase claimed by Bell.

In the seminal case of *Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 363, 144 A.2d 648, 660 (1958), our Superior Court stated that "[w]hen there is an occurrence after the test

year which affects with certainty, after consideration of all factors, the test year data then the commission may properly give effect thereto." In this instance, the impending AT&T divestiture was an occurrence which was substantially certain to affect test year data, thereby enabling the PUC to consider evidence concerning the effect of divestiture. In *Pittsburgh* the Court also indicated that data supporting out-of-period adjustments must be "sufficiently specific to indicate with reasonable certainty the approximate amount" by which revenue requirements would be affected. *Id.* at 362, 144 A.2d at 660.

> In its Long Form Opinion, page 86, the PUC stated: Since divestiture will occur on January 1, 1984, there obviously is no actual historical record or experience available with which to compare these public policy adjustments. It does not however follow that estimates of the effect of public policy are not quantifiable with a reasonable degree of certainty. The fact that successive updates reflected certain changes in the level of investment, expenses and revenues does not invalidate these estimations, provided that the methodology employed in making the estimates is reasonable. We find Bell's methodology acceptable for reasons we will explain later in more detail.

The opinion then analyzes in significant detail various components of the revenue calculation and states with sufficient specificity the sources which have been relied upon.[7]

---

[7] The PUC considered eight specific factors affecting revenue, namely, insider wiring maintenance revenue, embedded capital costs on charge for complex inside wiring, pole and conduit revenues, AT&T reimbursements, IntraLATA post test year toll revenues, ATTCOM and EBO official service revenues, customer premises equipment phase-out and miscellaneous sources.

Although there have been several disparate revenue requirement estimations presented to the PUC, we hold that the data upon which the PUC has based its determination is sufficiently specific to indicate with reasonable certainty the approximate amount of Bell's revenue requirement for the test year ending December 31, 1979. The standard established in *Pittsburgh* requires reasonable, not absolute, certainty. We also recognize the exigent and unique situation faced by Bell and the PUC as a result of the AT&T divestiture. Because there is no historical data which could adequately serve as a basis for determining the revenues and expenses in this case, the PUC has properly considered the expert testimony presented by each of the parties and applied its own expertise to arrive at an adequately specific and reasonable result.[8]

Moreover, the PUC included in its decision the requirement that Bell supply revenue tracking data on a monthly basis to avoid excessive revenue recovery. We hold that this approach was reasonable in light of the circumstances and did not constitute an error of law as alleged by the OCA. Because our review of the record reveals substantial evidence to support the PUC's revenue requirement determination, we affirm this portion of the PUC's order.

### PUC Rejection of OCA Wage Proposals

The OCA contends that the PUC committed an error of law in rejecting two of its proposed downward adjustments to Bell's wage expense claim, one of which reflected a revised pension accrual rate of $17.8 million and the other purporting to reflect wage and fringe

---

[8] We note the PUC's rationale that to deny these costs could lead to a deterioration of services to the public's detriment as well as deny its shareholders a reasonable return on their investments.

benefit increases of $2.361 million gained pursuant to an August 1983 collective bargaining agreement. The OCA maintains that its proposals were based on more recent and accurate data and that the PUC has abused its discretion in failing to consider such relevant data. The PUC and Bell counter that the OCA has failed to sustain its burden of proof in proposing this "update" adjustment inasmuch as its proposals were based on data insufficient to recalculate properly these post-divestiture wage and pension expense adjustments.

We note that while the PUC may not ignore recent information and evidence in the record which may substantially affect a ratemaking determination, it is within the PUC's discretion to choose between conflicting estimates and reject proposed adjustments which it determines to have been improperly calculated. *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 568, 107 A.2d 745 (1954). Our review of the record reveals substantial evidence in support of the PUC's wage expense determination. It is also evident that the OCA's proposals failed to reflect post-divestment employee levels and were inconsistent with the PUC's use of a specific set of financial data on which to base all revenue and expense adjustments. Therefore, we hold that the PUC did not abuse its discretion in rejecting the OCA's wage proposals.

### PUC Rejection of Trial Staff Equipment Expense Proposals

The OCA further contends that the PUC erred by failing to rule on two adjustments proposed by the PUC Trial Staff concerning (1) CPE refurbishment and service order expenses and (2) CPE inventory carrying cost expense.[9] Bell and the PUC counter that these

---

[9] Trial Staff Witness Wagner testifed that Bell was transferring to AT&T almost all of the telephones it had formerly included in its

non-wage expense savings were estimated as part of the broader public policy adjustment and that the Trial Staff's proposed adjustment was poorly calculated and duplicative of Bell's efforts.[10] We agree with Bell and the PUC on this issue.

Our review of the record indicates that the PUC did indeed consider the testimony of a Trial Staff witness (Long Form Opinion, pp. 107-108), but chose instead to rely upon Bell's proposed modified force reduction adjustments which included a reduction to non-wage expenses. As determined in *UGI Corp.*, where the PUC is faced with a choice of actions, each fully explained in the record, its acceptance of one course of action implies the rejection of the other. Therefore, we find no error of law as alleged by the OCA.

### *Western Electric (WECO) Tax Deferrals*

Lastly, OCA contends that the PUC erred in failing to reduce Bell's rate base to properly account for the restoration of certain tax deferrals associated with the purchase of equipment and products from its former subsidiary WECO. OCA maintains, and Bell concedes, that the amount of the deferral restored to the rate base should offset the increase in the associated accumulated deferred tax reserve and the depreciation reserve and produce no rate base or revenue requirement effect. Despite this apparent understanding, the adjustment to restore WECO tax deferrals nevertheless produced a $1.1 million rate base increase.

---

rate base, thus virtually eliminating these expenses. OCA contends that these adjustments, if adopted, would have reduced Bell's allowed rate increase by $23.8 million.

[10] At oral argument the PUC withdrew the argument contained in its brief that OCA did not preserve this issue for review by failing to raise these adjustments before the PUC.

An OCA tax witness testified that the net increase was caused by Bell's failure to remove the amount of WECO deferral attributable to a short-term telephone plant under construction. The PUC declined to rectify this purported error, however, because it considered the adoption of this revenue reduction to be unfair without reconsidering other potential increased revenue claims as set forth in Bell's final revised claim. The PUC now contends that this adjustment proposal was previously considered as part of the public policy adjustment.

We hold that the PUC's failure to fully account for the WECO deferrals was improper. As indicated by the OCA tax witness, the fact that some of the deferred taxes were associated with short-term construction work in progress (CWIP) and would not be placed into the plant service account for up to six months after the end of the future test does not justify an artificially created rate base increase. Moreover, the placing into service of this telephone plant under construction was sufficiently known and definite to occur as to require Bell and the PUC to treat it consistently with other regular future test year billing changes. Therefore, we remand this issue to the PUC for a determination of the amount of the rate base reduction related to the restoration of WECO deferred tax and reduce Bell's revenue requirement accordingly.[11]

Therefore, the PUC order granting Bell a $198,471,000 rate increase is affirmed in all respects with the exception of the WECO tax deferral, which portion is vacated and remanded consistent with this opinion.

---

[11] While Bell has conceded the validity of OCA's instant contention, Bell does contest the quantitative effect of the WECO tax deferral restoration. Therefore, we remand for a calculation of this effect by the PUC.

## ORDER

The Pennsylvania Public Utility Commission order, No. R-832316 dated November 21, 1984, is affirmed in all respects except as to the Western Electric tax deferrals. That portion of the order is vacated, and this case is remanded for a determination of the amount of the rate base reduction related to the restoration of Western Electric's deferred tax and for a reduction of Bell's revenue requirement accordingly.

Jurisdiction relinquished.