T. W. Phillips Gas & Oil Co., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

218

Argued November 14, 1979, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr., Mencer and Rogers. Judges Blatt, Craig, MacPhail and DiSalle did not participate.

*W. Russell Hoerner,* with him *Vincent Butler,* of *Morgan, Lewis & Bockius,* for petitioner.

*Edward Muhce,* with him *Charles Hoffman,* Assistant Counsel, *Daniel F. Joella,* Deputy Chief Counsel, *George M. Kashi,* Acting Chief Counsel, and *Steven A. McClaren,* Deputy Chief Counsel, for respondent.

OPINION BY JUDGE ROGERS, March 21, 1980:

T. W. Phillips Gas and Oil Company (Phillips), a utility which furnishes gas service to the public of western Pennsylvania and which sells gas to other gas utilities for resale, has appealed from an order of the Pennsylvania Public Utility Commission allowing Phillips an increase in annual operating revenues of $2,350,000, an amount $2,565,046 less than that proposed by Phillips.

On July 1, 1976, Phillips filed Supplements No. 39 and No. 40 to Tariff Gas—Pa. P.U.C. No. 1 and Supplements No. 17 and No. 18 to Tariff Gas—Pa. P.U.C. No. 2, proposing increases and changes in existing rates which would yield additional annual revenues of $4,915,046. On August 26, 1976, the Commission suspended the effective dates of the proposed rates until March 1, 1977 and instituted an investigation to determine the fairness, reasonableness, justness and lawfulness of the existing and proposed rates. The test year was the twelve months ending March 31, 1976. On March 1, 1977, the Commission extended the suspension for an additional three months until June 1, 1977. On June 1, 1977, the Commission allowed Phillips to file temporary rates calculated to increase its annual operating revenues by $2,000,000. The temporary rates became effective June 2, 1977.

After seven days of hearings, the Commission concluded on September 21, 1978 that Phillips was entitled to annual operating revenues of $350,000 in excess of those which would result from the temporary rates. It therefore disallowed the proposed revenue increase of $4,915,046 and authorized Phillips to file tariff supplements which would yield an increase of $2,350,000 in annual operating revenues, an amount $2,565,046 less than Phillips had proposed. In reaching this decision, the Commission concluded, *inter alia*, (1) that the fair value of Phillips' property was $55,-

600,000 as compared with a value of $76,000,000 claimed by Phillips, (2) that a fair rate of return on such property was 9.75% as compared with a rate of 10.8% claimed by Phillips, and (3) that the amount of income tax expenses claimed by Phillips should be reduced by $547,267 to reflect the amount of taxes which would have been payable if Phillips' actual capital structure included the amount of debt considered by the Commission to be appropriate for a utility of Phillips' size. Phillips has filed a petition for review, challenging these conclusions.

## Fair Value

The adjusted original cost measure of value of Phillips' properties used and useful in serving the public was $49,181,864; and the adjusted five-year trended original cost measure of value was $77,353,141. The Commission decided that the fair value rate base of the company's property was $55,600,097. The Commission reached its determination of fair value by weighting original cost and trended original cost by percentages corresponding to the percentage of debt and the percentage of equity, respectively, in the capital structure. It did not, however, use Phillips' actual debt ratio of 34.8% or its actual equity ratio of 65.2%, the use of which would have produced a fair value figure much closer to the five-year trended cost than to original cost; the Commission instead used a hypothetical debt ratio of 55% and a hypothetical equity ratio of 45%. It then made further calculations, in which the amount of original cost was factored twice but five-year trended cost factored only once, to arrive at its final determination of fair value, which happens to be 113% of original cost. The Commission's thesis for the method used is, we gather, that to the extent that the utility's properties have been funded by the issuance of securities bearing fixed interest

rates, consideration need not be given to the effect of inflation in determining interest fair value, and that a means of eliminating the effect of inflation is to weight original cost by the debt ratio. Phillips complains of the use of the weighting method, the Commission's double weighting of original cost and its use of hypothetical instead of actual debt and equity ratios.

Indeed, one might wonder why original cost should be twice factored into the calculations; or why it is appropriate to employ capital structure components in the determination of fair value where they are also used in determining rate of return; or why indeed capital structure is relevant to an inquiry into property values. None of these speculations furnish proper grounds for disturbing the Commission's determination. In *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Co.*, Pa. , , A.2d , (filed February 1, 1980), the Pennsylvania Supreme Court declared that where the Commission has not valued the utility's properties below their original cost or at figures in excess of their reproduction costs, but has fixed on values between these extremes, "the question is one of policy for the regulatory body concerning which the judicial branch is not warranted in interposing economic theories. Unless the PUC's decision does not bear a real and substantial relationship to the regulatory objects sought to be obtained by it, that judgment must prevail." Since the Commission has here valued the utility's properties between the forbidden extremes we may not overturn its decision because we may disagree with the theories which it believes supports its action. The ultimate regulatory objects sought here to be obtained are just and reasonable rates. We cannot say that a fair value equal to 113% of original cost and about 21% of the difference between original

and five-year trended cost does not bear a real and substantial relationship to the regulatory objects sought to be obtained and must therefore defer to the Commission's judgment.

## Rate of Return

The Commission found that Phillips should be allowed a rate of return of 9.75% on the fair value of its property. It made this finding, using a hypothetical capital structure, as follows:

| Type | Ratio | Cost | Weighted Cost |
|------|-------|------|---------------|
| Long Term Debt | 55% | 8.5% | 4.675% |
| Common Equity | 45% | 11.28% | 5.075% |
| | 100% | | 9.750% |

Phillips does not dispute the 8.5% cost of long term debt but says that there is no evidence in the record to support the finding of an 11.28% cost of common equity.

The only evidence concerning fair rate of return was the testimony of Phillips' experts witness, Frank J. Hanley. Mr. Hanley testified that, based on a recommended assumed capital structure of 50% debt and 50% equity, Phillips' cost of equity would not be less than 12.5%. In reaching this conclusion, Mr. Hanley used several measures of cost, but gave greatest emphasis to financial data concerning gas distribution companies whose stock is publicly issued and traded. He testified that market prices provide the most accurate information concerning the cost of equity and since Phillips' common stock has never been publicly traded, he studied the prices of similar risk gas utilities. The Commission summarized a portion of Mr. Hanley's data as follows:

### TABLE IV

Adjusted Earnings—Price Ratios (1)

| | 1971-75 | 1973-75 | 1975 | 1976 (2) |
|---|---|---|---|---|
| | % | % | % | % |
| Moody's 10 Gas Dist. | 12.6 | 14.3 | 16.1 | 12.8 |
| A Rated Gas Dist. [(3)] | 12.9 | 14.8 | 16.1 | 13.2 |
| Aa Rated Gas Dist. (4) | 13.2 | 14.8 | 18.0 | 13.8 |

 (1) Earnings-price ratios are adjusted by 10 percent to reflect market pressure and expenses of new issues.

 (2) Based on approximate mid-1976 market data.

 (3) Includes the seven companies of Moody's 10 which have A rated bonds plus Equitable Gas Company.

 (4) Includes the remaining three companies of Moody's 10—these companies have bonds rated Aa.

### TABLE V

Market Price-Book Value Ratios
Earnings-Book Value Ratios

| | 1971-1975 | | 1973-75 | | 1975 | | 1976 (1) | |
|---|---|---|---|---|---|---|---|---|
| | MP-BV | E-BV | MP-BV | E-BV | MP-BV | E-BV | MP-BV | E-BV |
| | % | | % | | % | | % | |
| Moody's 10 Gas Dist. | 115-12.0 | | 100-12.0 | | 86-11.9 | | 104-11.9 | |
| A Rated Gas Dist. (2) | 110-11.5 | | 97-11.5 | | 82-11.1 | | 99-11.5 | |
| Aa Rated Gas Dist. (3) | 120-13.7 | | 101-13.4 | | 89-14.3 | | 108-13.6 | |

 (1) Date for 1976 is on a spot basis.

 (2) Includes the seven companies of Moody's 10 which have A rated bonds plus Equitable Gas Company.

 (3) Includes the remaining three companies of Moody's 10—these companies have bonds rated Aa.

Mr. Hanley testified that this market data indicated the appropriateness of a 12.5% cost of equity and that this cost would cause the stock to sell at 1.2 to 1.3 times its book value, an amount which he believed to be necessary to prevent the stock from selling below book value in a pessimistic market.

The Commission rejected Mr. Hanley's analysis and recommendation and concluded that "[b]ased upon the evidence found in the record and giving consideration to our allowed capital structure [55% debt, 45% equity], we find 11.28 percent to be respondent's

cost of equity capital for purposes of rate of return in these proceedings.'' The Commission cited no evidence to support this finding. The evidence the Commission itself summarized in Tables IV and V clearly indicates a higher cost than that allowed. Only the 11.1% earnings/book value ratio for companies with A rated bonds in 1975 is less than the cost fixed by the Commission. This was not substantial and competent evidence in support of the Commission's determination. In *United States Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978), we held that the allowance of a rate of return below the cost of capital must have support in the record. We will therefore remand the record to the Commission to make new and appropriate findings on this issue.

TAX EXPENSE

Phillips claimed $643,878 for deferred State and Federal income taxes. The Commission allowed $547,656. The difference in the two figures is the result of a difference of opinion between Phillips and the Commission as to the amount of deduction to be taken for interest in calculating the taxes. Phillips had short-term annual interest expenses of $49,230. In addition it had outstanding $14,000,000 in debentures bearing 11% interest. Therefore, its total actual annual interest expense was $1,589,230. The Commission again assumed a hypothetical debt ratio of 55%, multiplied this by the original cost measures of value ($49,181,864) arriving at a hypothetical total debt of $27,050,025. This it multiplied by a hypothetical interest rate of 8.5%[1] to arrive at a hypothetical interest cost of

---

[1] Phillips' fair rate of return expert testified that for fair rate of return purposes the use of an 8.5% figure for interest on Phillips' $44,000,000 embedded debt was more appropriate than the use of 11% it actually bore.

$2,299,252. Phillips says that interest on its long-term debt should be computed by multiplying its long-term debt of $14,000,000 by the hypothetical 8.5%, producing $1,190,000 which, when the $49,280 of short-term interest expense was added, produced a properly deductible total interest of $1,239,280. Hence, Phillips seeks allowance of a hypothetical tax expense and the Commission has made a hypothetical disallowance. In *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission,* 17 Pa. Commonwealth Ct. 333, 331 A.2d 572 (1975), we addressed the issue of a hypothetical tax disallowance. We there wrote:

> The Superior Court consistently refused to allow hypothetical tax expenses. Pittsburgh v. Pa. P.U.C., 208 Pa. Superior Ct. 260, 222 A.2d 395 (1966); Penn Sheraton Hotel v. Pa. P.U.C., 198 Pa. Superior Ct. 618, 184 A.2d 324 (1962); Riverton Consolidated Water Company v. Pa. P.U.C., 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958); Pittsburgh v. Pa. P.U.C., 187 Pa. Superior Ct. 341, 144 A.2d 648 (1958); Pittsburgh v. Pa. P.U.C., 182 Pa. Superior Ct. 551, 128 A.2d 372 (1956). We see no more reason why hypothetical disallowances should be warranted.

> This is not to say that if managerial discretion is exercised with the purpose and effect of arranging the capital structures of a parent and controlled subsidiaries of requiring the latters' subscribers to pay higher rates to meet taxes and of affording the parent greater tax deductions, the Commission may not disallow some of the expense claimed by subsidiaries for taxes paid. Such action on the part of management would be an abuse of discretion, of which the Commission admits there is here no evidence in this record.

17 Pa. Commonwealth Ct. at 339, 331 A.2d at 575 (1975).

The Commission's brief for the first time in these proceedings says that it was an abuse of managerial discretion for Phillips to have such a low ratio of debt to equity. The argument is without merit. Not only did the Commission make no finding to this effect, the record shows that Phillips acquired its gas utility facilities in 1975 from an enterprise which did not employ debt capital in financing its business and that Phillips financed the acquisition by issuing stock and the 11% debentures here in question pursuant to a securities certificate registered by the Commission at that time.

Therefore, the proper amount to be deducted for interest expense in calculating deferred State and Federal income taxes was the amount actually paid or to be paid which our computation shows to be $1,589,-230. The record will be remanded for the purpose of calculating taxes based on actual interest expense.

The order of the Public Utility Commission, adopted June 22, 1978 and July 6, 1978, entered September 21, 1978, is reversed; the record is remanded to the Commission for redetermination of fair rate of return, for the adjustment of operating revenues to reflect deferred State and Federal income taxes based on actual interest expense, and for new findings as to the utility's entitlement to income available for return and to operating revenues, consistent with this opinion.

### Order

And Now this 21st day of March, 1980, the order of the Public Utility Commission, adopted June 22, 1978 and July 6, 1978, entered September 21, 1978, is reversed; the record is remanded to the Commission for redetermination of fair rate of return, for the ad-

justment of operating revenues to reflect deferred State and Federal income taxes based on actual interest expense, and for new findings as to the utility's entitlement to income available for return and to operating revenues, consistent with this opinion.

President Judge Bowman did not participate in the decision in this case.

Judge DiSalle did not participate in the decision in this case.