Carnegie Natural Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 2, 1981, before President Judge CRUMLISH and Judges MENCER, BLATT, WILLIAMS, JR., and CRAIG. Judges ROGERS, MACPHAIL and PALLADINO did not participate.

*Maurice A. Frater, McNees, Wallace & Nurick,* for petitioner.

*Frank B. Wilmarth,* Assistant Counsel, with him, *Steven A. McClaren,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

OPINION BY JUDGE CRAIG, August 25, 1981:

Carnegie Natural Gas Company (Carnegie), a wholly owned subsidiary of United States Steel (U.S. Steel) involved in the production and distribution of natural gas, has petitioned this court for review of an order of the Pennsylvania Public Utility Commission (commission) adopted on July 17, 1980, disallowing $2,765,889 of a requested $5,836,222 increase in Carnegie's annual revenue from its natural gas service.

Carnegie initiated this proceeding on October 26, 1979 by filing rate increase tariff supplements to apply to Carnegie's various customer classes, effective

December 26, 1979. However, on December 7, 1979, the commission initiated an investigation of the tariffs and their supplements, and a week later Carnegie filed additional supplements which extended the effective date to July 26, 1980.

At the time Carnegie submitted its proposed rate increases, its capital structure was devoid of long-term debt. However, in November 1979, Carnegie acquired long-term debt which caused its actual capital structure to be composed of 6.61% debt and 93.-39% equity.

After holding hearings at which it received evidence for and against Carnegie's proposed rates, the commission assigned Carnegie a hypothetical capital structure composed of 55% debt and 45% equity upon which the commission imputed a cost of capital to Carnegie and determined 10.87% to be a fair and reasonable rate of return for Carnegie to earn on its capital investment. Moreover, by using the debt component of the hypothetical capital structure to calculate a hypothetical interest expense which exceeded Carnegie's actual interest expense by $1,326,-000, the commission, for rate-making purposes, disallowed $651,000 of Carnegie's actual federal and state income tax expense.

Here Carnegie contends that the commission has precluded it from earning a fair return on its capital, and raises three issues for our review:[1] (1) whether the record contains substantial evidence to support the commission's conclusion that a capital structure composed of 55% debt and 45% common

_____
[1] Our scope of review in Public Utility Commission cases is limited to a determination of whether constitutional rights have been violated, an error of law committed, or its findings and conclusions are unsupported by substantial evidence in the record. *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission*, 53 Pa. Commonwealth Ct. 186, 417 A.2d 819 (1980).

equity is appropriate for a utility such as Carnegie; (2) whether the commission erred at law by utilizing a hypothetical interest expense to disallow $651,000 of Carnegie's claimed income tax expense; and (3) whether the commission erred in its allocation of revenues among Carnegie's rate classes.

## 1. *Capital Structure*

An important element of a utility's rates is the utility's cost of capital, which indicates the fair rate of return to be allowed on the fair value of its property used and useful in the public service, after allowance for proper operating expenses, taxes, depreciation and any other legitimate item. *Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission*, 54 Pa. Commonwealth Ct. 187, 422 A.2d 906 (1980). Where a utility's actual capital structure is too heavily weighted on either the debt or equity side, the commission, which is responsible for determining a capital structure which allocates the cost of debt and equity in their proper proportions, must make adjustments to the utility's capital structure. *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa. Commonwealth Ct. 135, 317 A.2d 917 (1974); *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958). In *Lower Paxton,* this court gave the following explanation for using a hypothetical capital structure:

The capital structure of a corporation may affect, sometimes drastically, the cost of capital. The capital structure is, in reality, little more than those dollars represented by its common and preferred stock and its debt. In some cases where the public utility is a wholly-owned subsidiary, its capital structure may not be comparable to another public utility which

is obliged to obtain its equity and debt financing in the open market. In other words, it may have on balance a too heavily weighted debt or equity. In this case the record discloses that Dauphin has a capital structure wherein 100 percent is equity capital. Under such circumstances the PUC must make adjustments based upon substantial evidence in order to reach a fair result. . . . It is also conceivable that there may be evidence on the record which will permit the PUC to utilize the capital structure and cost of capital statistics of comparable public utilities instead of those of the company or its parent.

The record before us reveals that, from 1974 through the initiation of this action, the proportion of common equity in Carnegie's capital structure has exceeded 90%. This fact alone is sufficient to justify the commission's imposition of a hypothetical capital structure to calculate the cost of Carnegie's capital. We find no basis for Carnegie's contention that the commission must show actual harm before it may impose a hypothetical capital structure; the quoted language in *Lower Paxton* requires the commission to make an adjustment in a utility's capital structure where the actual capital structure is weighted disproportionately on the debt or common equity side.

By deciding that a capital structure composed of 55% debt and 45% equity is appropriate for Carnegie the commission accepted the expert testimony of Andrew O'Donnell, the commission's trial staff expert, who testified that the hypothetical capital structure assigned to Carnegie is appropriate based upon various factors, including his comparison of Carnegie with a barometer group of utilities composed of nine integrated natural gas companies and nine gas distribution companies.

Carnegie contends that any comparison between those particular eighteen companies and Carnegie to determine an appropriate capital structure for Carnegie is invalid because the revenues and number of customers of those companies far exceed Carnegie's. Thus Carnegie argues that the record reflects that a proper capital structure for Carnegie is one composed of 35%-40% debt and 60%-65% equity.

Although we may agree that a determination should not be made by comparing Carnegie only with larger and more prosperous companies, we cannot agree that the record is devoid of substantial evidence to support the commission's finding as to an appropriate capital structure for Carnegie. To hold otherwise would require this court to ignore the record before it. As further evidence concerning what Carnegie's capital structure should be, the commission's trial staff presented the following table which reflects the capital structures of small gas utilities, more comparable to Carnegie.

*Capital Structures of Small Gas Utilities, December 31, 1978*

|  | Debt | Pref. | Common Equity |
|---|---|---|---|
| Cascade Natural Gas Corp. | 61.98 | 11.10 | 26.92 |
| City Gas Co. of Florida | 40.84 | — | 59.16 |
| Commonwealth Nat. Res. Co. | 30.52 | .61 | 68.87 |
| Elizabethtown Gas Co. | 51.30 | — | 48.70 |
| Mississippi Valley Gas Co. | 31.28 | — | 68.72 |
| North Carolina Natural Gas Co. | 54.13 | — | 45.87 |
| Penn Fuel Gas Co., Inc. | 48.19 | 10.37 | 41.44 |
| Peoples Gas System (Fla.) | 55.51 | — | 44.49 |
| Averages | 46.72 | 2.76 | 50.52 |

Noteworthy is the fact that the debt component of four of the above eight companies exceeds 50%.

Although Carnegie's evidence included a sampling of twelve companies (two of them also appearing in the eight above) having an average capital ratio of approximately 40% debt to 60% equity, further analysis of the figures indicates that, among the eighteen companies, the range of their debt components is from 5.8% to 61.9% and the range of equity components is from 26.9% to 94.2%. Moreover, eight of the eighteen companies have common equity proportions ranging from 48.70% down to 26.92%. Thus, 44% of the listed companies have common equity ratios which are less than 45% or exceed 45% by no more than 4%.

From these figures we cannot extract an infallibly correct capital structure to which the commission must absolutely adhere. However, we conclude that the record does contain substantial evidence upon which the commission properly exercised its discretion by imputing to Carnegie a hypothetical capital structure within a fair and realistic range.

2. *Hypothetical Income Tax Expense*

Income tax liability is an important item of operating expenses for which ratepayers are liable. *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979). A larger interest expense benefits Carnegie's ratepayers by reducing Carnegie's tax liability and consequently reducing its operating expense. Of course, a utility with insufficient debt in its capital structure will have a higher income tax expense than a utility which is more heavily leveraged.

Carnegie, based upon its actual capital structure, computed its actual interest expense for the test year to be $170,000. However, for ratemaking purposes, the commission, based upon Carnegie's hypothetical capital structure, increased Carnegie's interest ex-

pense by $1,326,000 and disallowed $651,000 of Carnegie's income tax liability.

Carnegie contends that *T. W. Phillips Gas and Oil Co. v. Pennsylvania Public Utility Commission,* 50 Pa. Commonwealth Ct. 217, 412 A.2d 1118 (1980), *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979), and *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 17 Pa. Commonwealth Ct. 333, 331 A.2d 572 (1975) stand for the proposition that hypothetical income tax allowances or disallowances are absolutely prohibited in Pennsylvania. We cannot agree.

This case differs from *Phillips* in that there the commission made no findings concerning unreasonableness of Phillip's capital structure because the issue was not raised before it but was raised for the first time on appeal.

Nor are the *Bell* cases pertinent to the matter now before us. In the *Bell* cases we were asked to decide, for ratemaking purposes, if a subsidiary's actual tax expense as reflected by its parent's consolidated return could be disregarded in favor of a subsidiary's tax expense based upon a hypothetical separate filing by the subsidiary. Here Carnegie's parent company did not file a consolidated return. The issue here is: Where a utility's disproportionate capital structure causes it to experience a substantially greater income tax expense than it would experience under normal circumstances, may the commission, for ratemaking purposes, disallow a utility's actual income tax expense and impute to the utility an income tax expense based upon a hypothetical capital structure

In resolving this issue we are guided by Section 315(a) of the Public Utility Code (Code), 66 Pa. C.S. §315(a), which reads as follows:

(a) Reasonableness of rates.

> In any proceeding upon the motion of the commission, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility.

Because 66 Pa. C. S. §315(a) explicitly places upon a utility the burden of proving the reasonableness of its rates, logic compels the conclusion that Carnegie must prove the reasonableness of those expenses which form the basis for its rates.

The record before us indicates that the disproportionate capital structure of Carnegie was the sole cause for its high income tax expense. Carnegie has provided no evidence to establish the reasonableness of its income tax expense; to the contrary, Carnegie's own expert testimony confirmed the unreasonableness of Carnegie's actual capital structure by pointing out that a more appropriate capital structure for a utility such as Carnegie would be composed of a substantially greater proportion in debt.

We therefore hold that the commission acted within its power by disallowing Carnegie's actual income tax expense, and calculating a new one based upon a more balanced capital structure. We agree with the commission's finding that the actual income tax expense is unreasonable and cannot be permitted to be passed on to Carnegie's ratepayers.

### 3. Allocation of Rates Among Carnegie's Customer Classes

Lastly Carnegie alleges that the commission erred in its allocation of Carnegie's increased rates among Carnegie's five classes of customers. Carnegie proposed to allocate the rates in a way which produced from each customer class an equal rate of return

based on the cost to Carnegie's for providing service to each class. However, the commission rejected Carnegie's proposal and ordered the rates of Carnegie's large industrial customer to be increased 7.-23%, which matched the percentage of the overall rate increase permitted by the commission. Moreover, the commission ordered that the rates of all other classes of customers be increased by the percentage which each class' increase under Carnegie's proposal bore to the overall dollar increase which Carnegie proposed for the class as a whole.

The establishment of a rate structure is an administrative function particularly within the expertise of the PUC. *Peoples Natural Gas Co. v. Pennsylvania Public Utility,* 47 Pa. Commonwealth Ct. 512, 409 A. 2d 446 (1979). Furthermore, "there is no law or usage in the industry which sets up a formula for determining a proper ratio between the rates of large industrial and, for example, domestic or residential users." *Natona Mills, Inc. v. Pennsylvania Public Utility Commission,* 179 Pa. Superior Ct. at 268, 116 A.2d at 879, cited with approval by this court in *United States Steel Corp. v. Commonwealth, Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978).

Here the fact that 95% of Carnegie's sales were to U. S. Steel, its parent and sole large industrial customer, provides substantial evidence that the commission's conclusion as to rates was fair and reasonable. Because the industrial risk is the prime reason for the increased revenue, we hold it fair and reasonable that U. S. Steel bear a substantial portion of that risk. Thus, supported by substantial evidence, the rate determination shall not be disturbed by this court. *Peoples Natural Gas Co.*

Accordingly, we affirm the decision of the commission.

ORDER

AND Now, August 25, 1981, the order of the Public Utility Commission is hereby affirmed.

Judge MENCER did not participate in the decision in this case.