T. W. Phillips Gas and Oil Co., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

T. W. Phillips Gas and Oil Co., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

206

Argued September 13, 1983, before President Judge Crumlish, Jr., and Judges Rogers, Williams, Jr., Craig, MacPhail, Doyle and Barry.

*Anthony C. DeCusatis*, with him, *W. Russel Hoerner, Morgan, Lewis & Bockius*, for petitioner.

*Frank B. Wilmarth,* Assistant Counsel, with him, *Albert W. Johnson, III,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Timothy F. Nicholson, Adler, Nicholson, Claraval & Magdule,* for Amicus Curiae, Pennsylvania Gas Association.

*William H. Kain, Kain, Brown and Roberts,* for Amicus Curiae, Association of Water Companies, Pennsylvania Chapter.

OPINION BY JUDGE ROGERS, March 26, 1984:

On August 28, 1981, T. W. Phillips Gas and Oil Co. (Phillips) filed with the Pennsylvania Public Utility Commission (Commission) Supplement No. 68 to its Tariff Gas-Pa. P.U.C. No. 1 and Supplement No. 38 to its Tariff Gas-Pa. P.U.C. No. 2 to become effective October 27, 1981. Supplement Nos. 68 and 38 proposed a base rate increase in annual revenues in the amount of $10,318,621 or 24.3%, based on operating results for the test year ending April 30, 1981.

Phillips is a wholly owned subsidiary of TWP INC. producing, gathering and distributing natural gas entirely within Pennsylvania. As of April 30, 1981, the end of the test year, Phillips furnished gas service to 45,264 residential customers, 3,390 commercial customers, 43 industrial customers, and 10 resale customers. Approximately 26% of its gas supply comes from its own producing gas wells.

The Commission entered an order on October 29, 1981 instituting an investigation of Phillips' existing and proposed gas rates, rules and regulations and suspending the effective date of Supplement Nos. 68 and 38 until May 27, 1982. Also complaints against the proposed rate increases were filed.

From November, 1981 through February, 1982, a total of fourteen evidentiary hearings were held and on April 9, 1982 Administrative Judge EDWARD R. CASEY presented a recommended order allowing $5,776,353 of additional annual revenues. The Commission on May 27, 1982 adopted and entered an order allowing Phillips $6,624,592 of additional annual revenues.

To our docket number 1506 C.D. 1982, Phillips appealed from the Commission's May 27, 1982 order. It states questions concerning many if not most of the major components of gas utility rates.

To our docket number 1521 C.D. 1982, Phillips appealed from an order of the Commission dated June 25, 1982 in which the Commission denied the appellant's petition that the Commission correct mathematical errors in the order of May 27, 1982.

We consolidated the appeals for argument and disposition.

Our scope of review is limited to determining whether or not constitutional rights were violated, an error of law was committed or a finding of fact was unsupported by substantial evidence. *Mill v. Pennsylvania Public Utility Commission*, 67 Pa. Commonwealth Ct. 597, 447 A.2d 1100 (1982). In *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company*, 19 Pa. Commonwealth Ct. 214, 220, 341 A.2d 239, 244 (1975), *rev'd on other grounds,* 492 Pa. 326, 424 A.2d 1213 (1980), *cert. denied,* 454 U.S. 824 (1981), we stated that:

> [T]he appellate courts cannot conceive an independent judgment from the record, and substitute it for the judgment of the PUC. We may not indulge in the process of weighing evidence and resolving conflicts in testimony. The PUC's discretionary finding and conclusions must be accepted unless they are totally without

support in the record, are based on error of law, or are unconstitutional.

### NUMBER 1506 C.D. 1982

#### I. Rate of Return

The Commission found that Phillips should be allowed a rate of return of 12.83% on the fair value of its property. In calculating the rate of return, the Commission used a hypothetical capital structure composed of 55% debt and 45% common equity, 10.24% as the cost of debt and 16% as the cost of common equity.

Phillips of course contests the use of a hypothetical capital structure. It does not, however, say what the rate of return should be if the Commission's hypothetical capital structure were to be used.

Phillips contends that the cost of common equity should have been not less than 18%. It does not dispute the Commission's finding of 10.24% as the cost of debt.

#### A. Hypothetical Capital Structure

Phillips' expert witness, Frank J. Hanley, testified that Phillips' actual capital structure of 39.9% debt and 60.1% common equity is appropriate for a small gas utility like Phillips and should have been used by the Commission for ratemaking purposes. He stated that risks associated with integrated gas operations and the general trend in all types of gas utilities toward higher equity ratios made Phillips' actual capital structure appropriate. To support these conclusions, Hanley used the capital structures from 1976 to 1980 of three barometer groups, Eleven Small Gas Distribution Companies, Moody's Nine Gas Distribution Companies and Moody's Nine Integrated Gas Companies. He testified that although he considered all the data he "placed greatest emphasis on the data for the eleven small gas distribution com-

panies because they are more similar to the Company [Phillips.]'' The capital structures of the three barometer groups were as follows:

| Type of Capital | 1976 | | | 1977 | | | 1978 | | | 1979 | | | 1980 | | | Average | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | A | B | C | A | B | C | A | B | C | A | B | C | A | B | C |
| Long-Term Debt | 54.5 | 52.2 | 51.0 | 53.7 | 51.0 | 49.1 | 53.4 | 48.5 | 47.3 | 52.2 | 46.2 | 48.6 | 50.1 | 45.4 | 46.3 | 52.8 | 48.6 | 48.5 |
| Preferred Stock | 6.8 | 9.6 | 5.1 | 6.8 | 9.7 | 5.2 | 6.4 | 10.2 | 5.3 | 5.8 | 10.5 | 5.0 | 5.3 | 10.3 | 4.9 | 6.2 | 10.1 | 5.1 |
| Common Equity | 38.7 | 38.2 | 43.9 | 39.5 | 39.3 | 45.7 | 40.2 | 41.3 | 47.4 | 42.0 | 43.3 | 46.3 | 44.6 | 44.3 | 48.8 | 41.0 | 41.3 | 46.4 |

All the above figures represent percentages.

A — Eleven Small Gas Distribution Companies

B — Moody's Nine Gas Distribution Companies

C — Moody's Nine Integrated Gas Companies

Hanley also stated that if a hypothetical capital structure were used, it should be 50% debt and 50% common equity. He based this recommendation on the capital structure of Moody's Nine Integrated Gas Companies for 1980. Hanley argued that Phillips "is easily identified as an integrated company because it has its own production facilities" and should have a higher common equity ratio than the members of Moody's Nine Integrated Gas Companies because it is smaller than they and, due to its limited marketability and liquidity, is a riskier investment.

The Trial Staff's expert, Andrew R. O'Donnell, concluded that the three barometer groups supported a hypothetical capital structure of 55% debt, 5% preferred stock, and 40% common equity. He also placed great emphasis on the data concerning the Eleven Small Gas Distribution Companies and did not consider it necessary to consider Moody's Nine Integrated Gas Companies.

Administrative Law Judge Casey found the use of a hypothetical capital structure appropriate because Phillips' actual capital structure was "out of proportion with industry trends and averages." He recommended a hypothetical capital structure "midway between that proposed by the Trial Staff and Phillips of 55 percent debt and 45 percent equity." Judge Casey did not include preferred stock as part of his recommendation because he did not find it to be a practical or realistic method of raising capital for a company the size of Phillips and because it had fallen into disuse during the last five years among the Eleven Small Gas Distribution Companies.

The Commission adopted Judge Casey's recommendation of a hypothetical capital structure composed of 55% debt and 45% common equity. It stated that a hypothetical capital structure was nec-

essary to determine a fair rate of return because Phillips' actual capital structure was "clearly atypical, whether compared to integrated gas companies, or distribution gas companies." The Commission found Phillips to be most comparable to the Eleven Small Gas Distribution Companies because the latter's members were closer in size to Phillips and, like Phillips, were engaged in production operations. Finally, the Commission noted that the hypothetical capital structure that it adopted for Phillips contained almost the identical percentage of common equity as the Eleven Small Gas Distribution Companies had in 1980.

In *Carnegie Natural Gas Co. v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 436, 439, 433 A.2d 938, 940 (1981), we held that "[w]here a utility's actual capital structure is too heavily weighted on either the debt or equity side, the commission, which is responsible for determining a capital structure which allocates the cost of debt and equity in their proper proportions must make adjustments to the utility's capital structure."

The Commission's use of a hypothetical capital structure was in accordance with the law. Its finding that Phillips' actual capital structure was "clearly atypical" and its conclusion that a hypothetical capital structure composed of 55% debt and 45% common equity was appropriate for Phillips is supported by the data on the three barometer groups and the testimony of Mr. O'Donnell.

### B. Cost of Common Equity

The cost of common equity is the best estimate of what an investor would pay for a current issue of common stock. Phillips' common equity is held entirely by its parent TWP INC. The cost of common

equity is not to be found at the market; nor is there a pat formula for use in reviewing a Commission determination of the cost of Phillips' common equity. *See Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company,* 19 Pa. Commonwealth Ct. at 231, 341 A.2d at 250.

Mr. Hanley, Phillips' expert witness, testified that a 16% cost of common equity rate was appropriate for the 60.1% common equity ratio contained in Phillips' actual capital structure and that an 18% cost of common equity rate was appropriate for the 50% common equity ratio contained in the hypothetical capital structure he recommended. He explained that the difference between the two common equity cost rates was due to the need to represent the inverse relationship between the risk to the common equity holder and the percentage of common equity capital in the capital structure. Specifically, Hanley stated that he calculated the 2% difference between the 16% rate for the 60.1% common equity ratio and the 18% rate for the 50% common equity ratio based on his finding that for the years 1976 to 1980, a 1% change in the common equity ratio of Moody's Nine Integrated Gas Companies resulted in a .17% change in their cost of common equity. Therefore, a 10.1% difference in Phillips' common equity ratios (60.1% — 50%) merited at least a 1.72% difference in the cost of common equity (10.1% x .17%).

Hanley's recommendations were based on data on the three barometer groups of which he placed greatest emphasis on the Eleven Small Gas Distribution Companies. He used four methods to determine the cost of common equity rate and ascertained the following results for the three barometer groups:

| Methodology | Cost of Common Equity | | |
|---|---|---|---|
| | Eleven Small Gas Distribution Companies | Moody's Nine Gas Distribution Companies | Moody's Nine Integrated Gas Companies |
| Earnings/price ratios | 16.0% | 16.0% | 16.0% |
| Discounted cash flow | | | |
| Dividend Yield | 10.1% | 10.3% | 7.0% |
| Growth | 6.7% | 6.0% | 8.6% |
| Total | 16.8% | 16.3% | 15.6% |
| Bare Rent approach | 18.6% | 18.6% | 18.6% |
| Capital asset pricing model | 17.6% | 18.2% | 20.3% |

The trial staff's expert witness, Mr. O'Donnell, recommended a 15.5% cost of common equity rate on a 40% common equity ratio. He disagreed with three aspects of Hanley's assessment. First, he did not include Moody's Nine Integrated Gas companies in his study. Second, O'Donnell found the bare rent method yielded a common equity cost rate 3% lower than Hanley's because he predicted inflation to be 8% and Hanley predicted it to be 11%. Finally, O'Donnell stated that the capital asset pricing model predicted a common equity cost rate for Moody's Nine Distribution Companies of 14.99% and for the Eleven Small Gas Distribution Companies of 14.55% when a geometric mean was used to calculate the equity risk premium and 16.84% for Moody's Nine Gas Distribution Companies and 16.23% for the Eleven Small Gas Distribution Companies when an arithmetic mean was used to calculate the equity risk premium.

Hanley used the arithmetic mean and the yield on three month Treasury Bills as the basis for his risk free rate; but O'Donnell testified that the geometric mean was preferable and that he had used

the yield on 91-day Treasury Bills for his risk free rate.

Judge CASEY found that a 16.75% cost of common equity rate was appropriate for his hypothetical capital structure of 45% common equity. His finding took into account Phillips' integrated and distribution characteristics and was premised on the discounted cash flow and bare rent methods. He calculated a discounted cash flow rate of 16.38% and a 17.1% bare rent approach rate using a 9.5% rate of inflation. To test the reasonableness of his 16.75% cost of common equity, Judge CASEY computed a capital asset pricing model rate of 16.83% using the calculations of Hanley and O'Donnell.

The Commission found a 16% cost of common equity rate "based primarily upon our analysis of the DCF [discounted cash flow] and bare rent methodologies." Its discounted cash flow rate of 16% was calculated using a 10% dividend yield rate and a 6% growth rate. To derive the appropriate dividend yield rate and growth rate, the Commission stated that it gave weight to the equity costs of Moody's Nine Integrated Gas Companies because Phillips "does engage in significant production and transmission operations" as well as the dividend yield rate for the Eleven Small Gas Distribution Companies because its members were of similar size to Phillips. The Commission calculated a 16% bare rent approach rate premised on a 9.5% inflationary risk rate, a 4% equity risk rate, and a 2.5% bare rent rate. The difference between the Commission's bare rent rate calculation and Phillips' is attributable to the Commission's use of Judge CASEY's inflationary risk rate of 9.5% instead of Phillips 11% and its choice of a 4% equity risk rate and apparent rejection of Phillips' 4.8% equity risk rate. The Commission also rejected Phillips' suggested .3% upward adjustment for the

greater risk of A rated government notes as opposed to Aa rated public utility bonds.

There is obviously substantial evidence in the record to support the Commission's 16% cost of common equity rate. Phillips does not dispute the Commission's 16% bare rent approach rate, but argues that the 16% discounted cash flow rate is not supported by substantial evidence. We disagree. The Commission's finding is based on a weighing of the uncontested discounted cash flow rates of Moody's Nine Integrated Gas Companies and the Eleven Small Gas Distribution Companies. These rates were 15.6% and 16.8%, respectively, and thus the Commission's discounted cash flow rate lies between the two rates.

A summary of the Commission's findings of a 12.83% rate of return which we find is supported by substantial evidence is as follows:

| Type of Capital | Ratio | Cost Rate | Weighted Cost |
|---|---|---|---|
| Debt | 55% | 10.24% | 5.63% |
| Common Equity | 45% | 16.00% | 7.20% |
| | | | 12.83% |

## II  Expenses

### A.  Hypothetical Income Tax Expenses

In determining the allowable amount of Phillips' income tax expense, the Commission disallowed $1,378,271 of federal income taxes actually paid by Phillips by calculating its taxes as if its capital structure consisted of 55% debt and 45% equity, a capital structure which it concluded was appropriate for Phillips.[1]

---

[1] The $1,378,271 in disallowed federal income taxes was calculated as follows:

In *Carnegie Natural Gas Company v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. at 444, 433 A.2d at 942, we held that the Commission may, for ratemaking purposes, disallow a utility's actual income tax expense and impute an income tax expense based upon a hypothetical capital structure when a utility's atypical capital structure causes it to incur substantially higher income taxes than it would were its capital structure arranged in a more typical fashion.

Phillips argues that the Commission erred by calculating a hypothetical income tax expense based on a hypothetical capital structure without making a finding that Phillips' management had abused its discretion by adopting a capital structure with the purpose and effect of imposing an unfair burden of tax expenses on the regulated utility. It relies on *Blue Mountain Consolidated Water Company v. Pennsylvania Public Utility Commission*, 57 Pa. Commonwealth Ct. 363, 426 A.2d 724 (1981); *T. W. Phillips Gas & Oil Co. v. Pennsylvania Public Utility Commission*, 50 Pa. Commonwealth Ct. 217, 412 A.2d 1118 (1980); and *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission*, 17 Pa. Commonwealth Ct. 333, 331 A.2d 572 (1975).

In *Big Run Telephone Company v. Pennsylvania Public Utility Commission*, 68 Pa. Commonwealth Ct. 296, 449 A.2d 86 (1981), the utility made the same argument in reliance on the same authorities. We there said that those cases do not stand for the prop-

| | |
|---|---|
| Commission Rate Base | $55,367,256 |
| Commission Weighted Debt Cost | 5.63% |
| | |
| Commission Interest | 3,117,177 |
| Company Interest | 1,738,906 |
| | |
| Increase in Interest | $1,378,271 |

osition that an interest expense may never be computed on the basis of a hypothetical capital structure. Indeed, in *Big Run* we stated that "an abuse is established when the evidence indicates that management has adopted a capital structure, in the absence of some compelling business reason, which because of its disproportionate nature imposes an unfair tax burden on ratepayers." *Id.* at 302, 449 A.2d at 86.

The Commission found that Phillips' actual capital structure was atypical and imposed a hypothetical capital structure—and it rejected Phillips' assertions that its actual capital structure was appropriate for a utility with its characteristics. The evidence supports this finding. Having found that a hypothetical capital structure was appropriate for Phillips, the Commission was free to use it as the basis for imposing a hypothetical income tax expense without having to find that Phillips' management had abused its discretion.

### B. Gas Production Expenses—Account Nos. 750, 752 and 753

Phillips next argues that the Commission erroneously reduced, for ratemaking purposes, the test year operating expenses of three of its gas production expense accounts (Account Nos. 750, 752 and 753) by the amount of $239,182.

In Account No. 750 are recorded expenses related to operation-supervision and engineering, including the salaries of supervisory employees and the wages of field laborers working in the production function. Phillips claimed a total of $517,810 as test year expenses for Account No. 750. Account No. 752 covers gas well expenses for the activities just mentioned and for well road repair, gauging wells and bailing and swabbing wells. Phillips claimed a total of $585,422 as test year expenses for this account. In Account

No. 753, for which Phillips claimed test year expenses totaling $145,667, expenses relating to the field line system are recorded. Field lines connect producing gas wells to transmission mains and employees must walk and check the lines for leaks, mow the lines and paint and install line markers. Operating expenses for these three accounts consist almost entirely of labor costs.

Staff research indicated, and the Commission found, that the operating expenses claimed for these three accounts reflected a 36.2% increase during the test year as compared to the 6.3% increase in these expenditures during the period May 1, 1978 through April 30, 1980, whereas maintenance expenses increased only 3.7% during the test year following a negative 14.6% decrease during the 24 month period preceding the test year.

The Commission determined that, for ratemaking purposes, the test year claims for the three accounts overstated normal levels of operating expense and that Phillips did not satisfactorily explain the significant and inconsistent increases in these accounts during the test year when compared with the level of expenses incurred in these accounts during the two year period immediately preceding the start of the test year.

The Commission concluded, therefore, that Phillips did not meet its burden of proof regarding the test year expense claims and proceeded to normalize the test year amounts by averaging those expenses with the prior two years' experience. This resulted in the *disallowance* of $67,534 for Account No. 750; $128,026 for Account No. 752; and $43,622 for Account No. 753, for a total reduction of $239,182.

Phillips insists that the level of test year expenses for the three accounts is reasonable and appropriate for ratemaking purposes and that the Commission

capriciously ignored extensive record evidence presented by Phillips supporting the reasonableness of its expense claims.

Our review of the record, however, reveals no capricious disregard of evidence and convinces us that there is substantial evidence to support the Commission's conclusion that Phillips failed in its statutory burden to justify its expense claims.

Phillips first argues that its test year expenses reflect current costs that are expected to continue, if not increase, in the future. It asserts that the production-related activities covered by these accounts must continually be performed in order to ensure safe and efficient service to its customers. It does not, however, account for the marked change in the test year levels of these activities from previous years' experience; increased labor costs alone do not sufficiently explain why the expenses in Account Nos. 750, 752 and 753 increased so significantly in the test year.

Alternatively, Phillips asserts that it uses its complement of full-time employees for various activities, depending upon the immediate needs of the company. Some functions may require more work hours than others in a particular year, and so it is misleading, Phillips argues, to isolate a few expense accounts and propose adjustments, for ratemaking purposes, solely because it appears that such accounts increased more than the average increase for all accounts. Phillips' witness testified in this regard that "if it is the case that there are increased work hours charged to a particular account, which is isolated for examination, it is also true that there must be a complementary reduction in work hours charged to some other account, and, therefore, a reduction in expenses for such other account or, at least, a lesser increase in such other account."

We agree with the Commission that this latter argument impliedly admits the irregularity of the accounts in question, and in that regard is inconsistent with Phillips' first assertion that the expenses for Account Nos. 750, 752 and 753 are necessary for the safe and efficient operation of the company and will continue at their present rate, if not increase, in the future. Furthermore, the Commission is correct in asserting that if the claims for the three accounts are inflated due to an increase in work hours and the number of employees assigned them during the test year, there should be a corresponding reduction, or at least, a lesser increase, in other accounts to reflect the disproportionate emphasis on these accounts. Phillips, however, provided no such evidence and as the burden was on the utility to demonstrate that the test year booked expenses in other accounts were unrealistically low, there was substantial evidence to support the conclusion that the test year claims were irregularly high and that Phillips failed to satisfy its burden of justifying them.

We, therefore, conclude that the Commission acted properly in adjusting downward, in the amounts earlier specified, the test year operating expenses of Account Nos. 750, 752 and 753, for ratemaking purposes.

### C. Depreciation Expense—Net Salvage Allowance

Phillips claimed an annual depreciation expense of $2,138,905 which included $63,356 of net negative salvage. In calculating its net salvage, Phillips excluded $401,044 which it had received from the sales of depreciable property during the five-year period prior to the conclusion of the test year and which if included in its net salvage calculations would have resulted in a positive net salvage value of $16,853 and an annual

depreciation expense of $2,219,114. The Commission concluded that the $401,044 in sales was improperly excluded from Phillips' net salvage calculations and adjusted its annual depreciation expense accordingly. Phillips argues that it properly excluded the $401,044 pursuant to the Commission's policy of excluding from net salvage "abnormal or nonrecurring items that are not associated with the normal life treatment of the property involved, such as insurance recoveries, outright sales of plant, and reimbursements for relocation of facilities." *Pennsylvania Public Utility Commission v. Philadelphia Electric Company,* 45 Pa. P.U.C. 576, 628-629 (1971). It also asserts that the effect of including the $401,044 as part of its net salvage was to deprive Phillips recovery of the original cost of its investment in depreciable plant from its customers.

Annual depreciation is an expense allowed in rates so that the utility may recover its investment in property devoted to its public service. *Pennsylvania Power & Light Company v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 335, 311 A.2d 151, 155-156 (1973). A component of a utility's annual depreciation expense is its net salvage allowance.

Net negative salvage is the amount of money by which the cost to a utility of removing retired property exceeds its salvage value, if any, In *Penn-Sheraton Hotel v. Pennsylvania Public Utility Commission.* 198 Pa. Superior Ct. 618, 638, 184 A.2d 324, 329 (1962), it was held that "[i]f the utility retires and removes a property without replacing it or replaces it after removal and incurs actual negative salvage in doing so, the expenditure should be capitalized and amortized by some reasonable method and for and over a reasonable length of time."

We are told that the Commission's practice in determining a utility's net salvage allowance is to average the most recent five years of a utility's actual net salvage. Net negative salvage is added to the annual depreciation expense. Conversely, when the salvage value exceeds the cost of removal, the net salvage value is positive and is deducted from the annual depreciation expense.

In response to a trial staff interrogatory, Phillips provided the following table indicating the salvage amounts which were excluded from its five-year net salvage amortization and its retirement rate analysis and the reason for their exclusion:

| Year | Salvage | Reason for Exclusion |
|------|---------|----------------------|
| 1976 | $ 16,476.00 | Sales |
| 1978 | 315,102.22 | Sales |
| 1979 | 65,907.87 | Sales |
| 1980 | 3,558.00 | Sales |
|      | $401,044.09 | |

Phillips' expert witness explained only the $315,102.22 sales. He testified that that item "relates to three gas wells and related lines and equipment which were sold to the developer of a shopping mall so that the developer could construct the mall." He stated that all the exclusions generally had the following characteristics:

1. They were sporadic rather than normal, regular occurrences.

2. They generally involved relatively new or young plant and equipment.

3. The service life of the items sold would not have ended at that time, if the sale had not taken place.

The trial staff's expert witness testified that the $401,044 should have been included in Phillips' net

salvage calculations. He stated that "[i]t appears that the company has excluded $401,044 from its net salvage calculations because it had eliminated the retired property from its retirement rate analysis." The expert explained that the omission of an item from a retirement rate analysis does not necessitate the item's exclusion from a net salvage calculations because retirement rate analysis averaging of experienced net salvage is a process for levelizing current annual net salvage for ratemaking purposes. Phillips' expert witness in rebuttal testimony testified that the exclusion of a transaction from a retirement rate analysis but not from net salvage calculation is "an inconsistency."

The Commission noted its policy of excluding abnormal or nonrecurring items from net salvage calculations, accepted the testimony of the trial staff's expert witness and concluded that Phillips had "excluded from the five year average, particular sales, each of which represent[s] significant positive net salvage." It also agreed with the trial staff's expert witness' opinion that it is not inconsistent to exclude an item from a retirement rate analysis but not from net salvage calculations.

Phillips argues that the $401,044 were sales of "abnormal and nonrecurring items" and thus must be excluded from its net salvage calculations pursuant to the Commission's policy. The Commission, however, found that the $401,044 represented significant positive net salvage" and therefore must be included in Phillips' net salvage calculations. This conclusion is supported by substantial evidence in the form of the testimony of the trial staff's expert witness.

Phillips also contends that the inclusion of the $401,044 in its net salvage calculations denies it recovery of the original cost of its investment; essential-

ly that it has suffered a depreciation deficiency. In *UGI Corporation v. Pennsylvania Public Utility Corporation*, 49 Pa. Commonwealth Ct. 69, 74, 410 A.2d 923, 926-927 (1980), we held that to prove that a depreciation deficiency will prevent the recovery of the full cost of its property devoted to the public service, the utility must prove that it has not received revenues sufficient to pay its operating expenses and to provide it with a fair return on its rate base during the years when the deficiency was created. Phillips has not pointed to any evidence in the record which demonstrates that this condition existed.

We therefore hold that the Commission did not err in recalculating Phillips' depreciation expense based on the inclusion of the $401,044 as part of net salvage.

### III  CASH WORKING CAPITAL—ACCUMULATED INTEREST

Cash working capital represents a utility's need for cash to meet current obligations arising out of the rendition of service for which revenues have not yet been received. The need arises because utilities typically pay their obligations on a current basis, whereas revenues are received later. *UGI Corporation v. Pennsylvania Public Utility Commission*, 49 Pa. Commonwealth Ct. 69, 74, 410 A.2d 923, 929 (1980). In *Pittsburgh v. Pennsylvania Public Utility Commission*, 370 Pa. 305, 309, 88 A.2d 59, 62 (1952), the Supreme Court held that "[t]he determination of the dollar amount of cash working capital is based on the time lag between the service rendered and the payment therefor by the consumer" and wrote that "[a]lmost invariably . . . [cash working capital] has been determined by the *actual* necessity therefor existent when disputed rates of an established and going concern are before the Commission" (emphasis added).

In calculating Phillips' cash working capital, the Commission deducted "accumulated interest" in the amount of $350,037 which it concluded Phillips paid as interest on its debt from revenues received in advance of the payment of the debt and which therefore were available as cash working capital. The figure $350,037 is based on an assumed and wholly hypothetical obligation to pay interest on debt in the amount of $3,117,177 and an assumed and hypothetical receipt of revenues to cover this obligation. These amounts are in turn the results of calculations starting from the hypothetical capital structure described earlier in this opinion.

Phillips' actual debt expense was $1,738,906 not $3,117,177 and the testimony of Phillips' expert accounting witness, which the Administrative Law Judge accepted, was to the effect that Phillips actually paid interest on its debt in advance of the receipt of revenues. He was able to make the calculations tending to prove this because Phillips had no debt before the year 1975.

The Commission cites *UGI Corporation v. Pennsylvania Public Utility Commission, supra,* and says that its "decision to utilize a hypothetical interest in the accumulated interest offset computation is a logical progression from our generally accepted practice of recognizing accumulated interest as a source of working capital." In *UGI* we held that the Commission could offset cash working capital by an amount which UGI set aside to pay interest on its long-term debt. *UGI* is distinguishable from this case because UGI did not contest, as Phillips does, the fact that it received revenues for the payment of interest on its debts before it was required to pay the interest.

The Commission may well have erred by computing and deducting a hypothetical interest obligation and

deducting this amount from cash working capital otherwise required, in the face of hard evidence to the effect that the payment of the interest on debt actually preceded the collection of revenues. The principle that a deduction may be made from cash working capital on account of revenues received in advance of their payment has no application if in fact this condition does not exist. As the Supreme Court wrote in *Pittsburgh v. Pennsylvania Public Utility Commission, supra,* cash working capital is determined by "the actual necessity therefor."

The Commission writes, however, that "[a]lthough Phillips argues that it has paid interest on debt prior to receipt of revenue, it has not produced evidence which would show that the company has collected insufficient revenues, through rates, to pay interest on debt prior to the inclusion of the debt costs in a rate proceeding." By giving the Commission the deference that is due it as the competent regulatory authority, we will infer from this language that the Commission has some reason based on the record to disregard Phillips' witnesses' testimony. We will vacate the Commission's order in this aspect of the case and remand for such findings and discussion as the Commission may wish to record as authority for its conclusion that Phillips has not paid interest on its debt prior to the receipt of revenues.

IV CURRENT RATE CASE EXPENSES

Phillips finally contends that the Commission unlawfully denied it recovery of one-half of its current rate case expenses.

Phillips claimed current rate case expenses in the amount of $448,711. The Commission, citing its recent policy of splitting rate case expenses between a utility's stockholders and ratepayers on a fifty-fifty

basis, allowed Phillips recovery of one-half of the amount claimed, $224,356.

Our recent case of *Butler Township Water Company v. Pennsylvania Public Utility Commission*, 81 Pa. Commonwealth Ct. 40,    A.2d    (1984), where we held that the Commission could not disallow a part of the utility's rate case expenses for general policy considerations identical to those here raised by the Commission, is controlling.

We will reverse the Commission in this regard.

NUMBER 1521 C.D. 1982
*Mathematical Errors*

After the Commission's order of May 27, 1982 was filed, Phillips filed a petition for the entry of a supplemental order alleging that errors had been made in the computation of its annual operating revenues under the new tariff, the correction of which would result in an increase in its operating revenues in the amount of $108,777. Specifically, Phillips alleged: (1) that in the calculation of the interest offset to cash working capital requirements, the income tax lag adjustment was computed on the basis of Phillips' proposed $10,440,467 increase in annual operating revenues rather than the $6,624,592 increase allowed; (2) that the figure $816,469 instead of $802,700 was used in denoting the taxes payable at the proposed rates in computing the accumulated federal funds available for cash working capital; (3) that the gross receipts tax paid by Phillips was not included as an income tax deduction in computing its cash working capital; (4) that in determining Phillips' change in taxable income, the sum of $21,691 was subtracted from rather than added to Phillips' taxable income; and (5) that the figure $998,091 instead of $998,901 was used as the

amount of cash working capital claimed by Phillips. The trial staff filed a reply brief recommending that the Commission correct the errors alleged by Phillips.

The Commission conceded that the corrections sought by Phillips "may be appropriate," but declined to enter a supplemental order. It held that with respect to errors (1), (2) and (3) Phillips had not filed specific objections to the Administrative Law Judge's recommended decision which was the source of the errors and that with respect to errors (4) and (5) the requested corrections would result in a *de minimus* change in Phillips' annual operating revenues. Phillips contends that it indeed did file timely objections to the Administrative Law Judge's recommended decision.

The Commission directs our attention to Section 35.213 of the General Rules of Administrative Practice and Procedure, 1 Pa. Code §35.213, which provides in part that:

> Objections to any part of a proposed report which is not the subject of exceptions may not thereafter be raised before the agency head in oral argument, or in an application for agency rehearing or reconsideration, and shall be deemed to have been waived. . . .

The Commission agrees that Phillips filed exceptions to the Administrative Law Judge's recommended decision alleging mathematical errors but contends that they were too general and unspecific. This characterization is disingenuous as the following excerpt from the Phillips' exceptions demonstrates:

> On Tables I-IV, attached to the Recommended Decision, there are computations, based upon the ALJ's adjustments, or operating revenues recommended by the ALJ to be allowed.

The ALJ made computational errors in Tables I-IV.

A mathematical error was made in the addition of expense adjustment in footnote (b) on Table IV.

The ALJ erred in computing accumulated tax funds available for working capital, shown on Table III, because the ALJ did not reflect the ALJ's adjustments to operating revenue and expenses as shown on Table IV. The amount of accumulated tax funds available for working capital, properly calculated to reflect the ALJ's reductions, is $492,339 and *not* $810,-265 as calculated on Table III.

As a result of errors in Tables III and IV, explained above, there is an error in Table II of the Recommended Decision. The amount of the accumulated tax offset should be $492,339 and not $810,265. The ALJ's expense adjustment should be $256,919. Correcting for these errors, the ALJ's expense adjustment should be $369,764 and not $52,105 as shown on Table II.

As a result of the error in Table II, there is an error in Table I of the Recommended Decision. The ALJ's adjustment for cash working capital should be $369,764 and not $52,105. Correcting for the error, the ALJ's Recommended Rate Base should be $48,378,123 and *not* $48,-060,464.

Because of the computational errors, explained above, the ALJ's allowances for operating revenue and income available for return, as shown on Table IV, are in error. Correcting for the computational errors, explained above, income available for return allowed by

the ALJ should be $6,371,396 and operating revenues allowed by the ALJ should be $48,781,606 instead of $48,720,894.

Ratemaking, it is true, is not an exact science. *Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981). It does not follow that where mathematical errors, acknowledged by all parties and harmful to one of them are brought to the attention of the Commission, it may dismiss them out of hand.

We will reverse the Commission's order appealed at No. 1521 C.D. 1982.

Definitive orders giving effect to the actions predicted in this opinion are entered herewith.

### ORDER IN 1506 C.D. 1982

AND Now, this 26th day of March, 1984, the Pennsylvania Public Utility Commission's order made May 27, 1982 insofar as it ordered the deduction from the appellant's cash working capital requirement of $350,-037 for assumed funds available from revenues received in advance of the payment of interest on debt is vacated and the record is remanded for findings and conclusions not inconsistent with our opinion herein; the Pennsylvania Public Utility Commission's order made May 27, 1982 insofar as it disallows the full recovery of the appellant's rate case expense is reversed. In all other respects, the Pennsylvania Public Utility Commission's order is affirmed. Jurisdiction is relinquished.

### ORDER IN 1521 C.D. 1982

AND Now, this 26th day of March, 1984, the Pennsylvania Public Utility Commission's order dated June 25, 1982 is reversed; and the record is remanded for a computation consistent with this opinion. Jurisdiction is relinquished.